RECEIPT # _____
AMOUNT $ _150.00_
SUMMONS ISS. _YC_
WAIVER OF SERV. _____
MCF ISSUED _____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MASSACHUSETTS LOCAL RULE 4.1

WILLIAM M. TYREE ) CIVIL ACTION IN THE NATURE
P.O. BOX-100 ) OF FOUR LEGAL CLAIMS PURSUANT
SOUTH WALPOLE, MA. 02071 ) TO THE FEDERAL TORT CLAIM ACT,
PLAINTIFF, Pro se ) (FTCA), 28 USC, §2671; ONE
) LEGAL CLAIM PUSUANT TO THE
V. ) PRIVACY ACT, 5 USC, §552a;
) ONE LEGAL CLAIM PURSUANT TO
) THE FEDERAL RECORDS ACT, (FRA),
UNITED STATES ARMY ) 44 USC, §2201; FALSE ARREST
CID AGENT PAUL MASON (Retired) ) AND IMPRISONMENT; INFLICTION
CID AGENT JOSEPH BURZENSKI (Retired) ) OF INTENTIONAL EMOTIONAL
DEFENDANTS ) DISTRESS; LOSS OF CONSORTIUM;
U.S. Department of Justice ) FAILURE TO ENFORCE AND EQUALLY
John J. Moakley Courthouse ) APPLY THE UNIFORM CODE OF
1 Courthouse Way, Suite 9200 ) MILITARY JUSTICE; FAILURE TO
Boston, Massachusetts 02210 ) INVESTIGATE AND CORRECT U.S.
(Main phone: 617-748-3100) ) ARMY RECORDS.
Counsel for Defendants )

04 - 11430 RCL

Referred To LP Cohen

## JURISDICTION

1. That, the jurisdiction of this United States District Court, (USDC), is invoked pursuant to the laws of the United States, and Massachusetts; the Constitution of the United States, and Massachusetts; cited caselaw herein, and with the pleadings to be filed by the Plaintiff; the Uniform Code of Military Justice, (UCMJ), inclusive of:

(a). **Article 7(a):**

"Apprehension is the taking of a person into custody..."

(b). **Article 9(d):**

"...No person may be ordered into arrest or confinement except for probable cause..."

(c). **Article 11(a):**

"No Provost Marshal...may refuse to receive or keep any prisoner committed to his charge by a Commissioned Officer of the Armed Forces, when the committing officer furnishes a statement, signed by him, of the offense charged against the prisoner..."

2

(d). **Article 84:**

> "Any person subject to this chapter who effects...a seperation from the Armed Forces of any person who is known to him to be ineligible for that...seperation because it is prohibited by law...shall be punished as a Court-Martial may direct..."

(e). **Article 107:**

> "Any person subject to this chapter who, with intent to deceive, signs a false record, return, regulation, order, or other official document knowing it to be false, shall be punished as a Court-Martial may direct..."

(f). **Article 134:**

> "Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the Armed Forces, all conduct of a nature to bring discredit upon the Armed Forces...of which persons subject to this chapter may be guilty, shall be taken cognizance of by a...Court-Martial...and shall be punished at the discretion of the Court."

(g). **Article 135(a):**

> "Courts of inquiry to investigate any matter may be convened by any person authorized to convene a general Court-Martial or by any other person designated by the Secretary concerned for that purpose..."

(h). **Article 138:**

> "Any member of the Armed Forces who believes himself wronged by his Commanding Officer, and who, upon due application to that Commanding Officer, is refused redress, may complain to any superior or commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon"

3

(i). "...Although only a member of the Armed Forces is
        entitled to redress under Article 138, petitioner's
        rights cannot be denied on lack of standing since
        it was the Army's error which led to his present
        nonmilitary status..." Colson v. Bradley, 477 F.2d
        639, 642 (8th Cir 1973).

(j). "...[A] court should not review internal military
        affairs in the absence of...the following factors
        ...1. The nature and strength of the plaintiff's
        challenge to the military determination...2. The
        potential injury to the plaintiff if review is
        refused. 3. The type and degree of anticipated
        interference with the military function...4. The
        extent to which the exercise of military expertise
        or discretion is involved..." Penagaricano v.
        Llenza, 747 F.2d 55, 60-61 (1st Cir. 1984).

(k). The Plaintiff can make a strong colorful challenge
        to the military determination;
(l). The potential injury to the Plaintiff is ongoing
        incarceration that began twenty five years ago;
(m). The type and degree of interference with the
        military function is the enforcement of the UCMJ;
(n). There is no demonstration of any military expertise
        is this case as reflected by the failure of the
        military to adhere  to, and equally dispense the
        UCMJ; there is no discretion involved in this
        case as the military had a statutory duty to
        perform through the implementation of the
        UCMJ which the military failed to do even after
        the military was put on notice in June 2003 of
        the numerous violations of the UCMJ in this case.

### THE PLAINTIFF SO ALLEGES:

### PARTIES

2. That, the Plaintiff, William M. Tyree, **Pro se**, is and was

at all times herein:

(a). a citizen of the United States, and a twice

honorably discharged veteran of the United States Army, (USA);

(b). the same person that the Defendant USA Criminal

Investigation Division, (CID), illegally apprehended, arrested,

4

confined, and then surrendered to the Massachusetts Police
Authorities, (MPA), on February 13, 1979, either at 1820 Hours,
(or later on 2/13/79), **without probable cause**, for the
murder of the Plaintiffs wife;

(c). the same person who has been incarcerated since
February 13, 1979, and currently is incarcerated within the
Massachusetts Dept. of Correction, at MCI-Walpole, P.O. Box-
100, S. Walpole, MA. 02071.


3. That, the Defendant, USA, is and was at all time herein:

(a). the entity of the United States government that
employed the Plaintiff as a soldier at the time of the
illegal apprehension, arrest, confinement, and surrender by
USA CID Agents (Paul Mason and Joseph Burzenski), and the
USA Fort Devens Provost Marshal, to MPA on **February 13, 1979**,
at 1820 hours, or there after on February 13, 1979;

(b). the entity of the United States government that
was notified in June 2003, upon discovery of the Massachusetts
Supreme Judicial Court, (SJC), decision that listed the actual
date and time of the Plaintiffs arrest as **February 14, 1979**;

(c). the entity of the United States government that
allowed itself to be litigated pursuant to 28 USC, §2671 Et seq.,
and whose address is The Pentagon, 101 Army Pentagon, Washington,
D.C., 20310-0101.

5

**4.** That, the Defendant(s):

    **(a).** USA CID Agent Paul Mason, is and was at all times herein a citizen of the United States who:

        **(1).** was on active duty at Fort Devens on 2/13/79, at 1820 hours, and who did **without probable cause** in violation of the UCMJ apprehend, arrest, confine, and surrender the Plaintiff to the MPA;

        **(2).** was employed by the USA and is currently retired;

        **(3).** currently lives within the United States and whose address is unknown, but who is represented by the Dept. of Justice;

    **(b).** USA CID Agent Joseph Burzinski, is and was at all times herein a citizen of the United States who:

        **(1).** reallege paragraph 4(a)(1) cited directly above: Agent Burzenski was the partner and working associate of Agent Mason who worked together on the evening of 2/13/79 at 1820 hours;

        **(2).** reallege paragraph 4(a)(2) cited directly above:

        **(3).** currently lives within the United States whose last known address was in Fitchburg, MA., and is represented by the Dept. of Justice;

        **(4).** all three Defendants will hereafter be referred to as either "USA" or "Defendant".

### PRELIMINARY STATEMENT

6

5. That, the Plaintiff alleges that the Defendant apprehended, arrested, confined, and surrendered the Plaintiff to MPA on February 13, 1979, at 1820 Hours, or there after on February 13, 1979 **without probable cause**, then upon discovery of the SJC decision listing the date of arrest as the date of February 14, 1979, the Plaintiff contacted the Defendant to investigate and correct the violations of the UCMJ and the Defendant did nothing.

6. That, the Defendant maintains that the CID and MPA took the Plaintiff into custody:

      **(a)**. on Fort Devens, Massachusetts, at the USA CID Field Office on **February 13, 1979, (2/13/79)**, at 1820 Hours, lawfully, and support that position with the **Verified USA DA Form 4187 1 May 74**, which was verified within 72 hours of the arrest, apprehnsion, confinement of the Plaintiff, and did confirm the arrest occurred on 2/13/79, at 1820 hours;

      **(b)**. and the entire matter of the Plaintiff's arrest irregardless of the time or date is barred from judicial/USDC review by the **Feres** Doctrine at **Feres v. U.S.**, 71 S.Ct. 153 (1950).

7. That the SJC found in **Commonwealth v. Tyree**, 387 Mass. 191, 203-204 (1982), that:

      "...**The next afternoon, Wednesday, February 14, Tyree went to the CID building at Fort Devens...after Tyree had entered the building...Tyree was arrested...**" (at pps. 203-204)

8. That, based upon the unchallenged published SJC opinion directly above, the Plaintiff is able to make a colorful showing that:

(a). his apprehension, arrest, confinement, and surrender at Fort Devens on 2/13/79, at 1820 Hours, entitled the Plaintiff to the equal protection of the UCMJ, at Article(s) 7, 9, 11, 84, 107, 134, 135 and 138;

(b). his apprehension, arrest, confinement, and surrender at Fort Devens on 2/13/79, (at 1820 Hours, or later on 2/13/79), occurred **without probable cause;**

(c). his apprehension, arrest, confinement, and surrender at Fort Devens on 2/13/79, (at 1820 Hours, or later on 2/13/79), was contrary to the finding of the SJC, the recognized court of jurisdiction, and resulted in the illegal arrest and imprisonment of the Plaintiff **without probable cause;**

(d). Defendant violated the UCMJ at Article(s) 7,9,11,84, 107,134, 135, 138,through their complained of actions on 2/13/79, set out above at ¶¶8(c);

(e). Defendant violated the UCMJ at Article(s) 84, 107, 134, 135, 138,when the Defendant did nothing to correct the illegal arrest and imprisonment of the Plaintiff after being clearly notified in June 2003, that the 2/13/79 arrest, surrender to the MPA, and ongoing imprisonment occurred **without probable cause;**

(f). Defendant did nothing after being notified in June 2003 of the **lack of probable cause on 2/13/79, at 1820**

8

**Hours** (or anytime on 2/13/79), and made a conscious decision
to continue violating the rights guaranteed to the Plaintiff
pursuant to the U.S. Constitution, the laws of the United States,
Massachusetts, and the UCMJ;

(g). the Defendant upon being notified that a civil
action for false arrest and imprisonment in April 2004, did
invoke the protection of the **Feres Doctrine** as a shield to
cover up and protect the Defendant from the scrutiny of the
USDC.


## FACTS

9. That, Elaine Tyree was murdered on 1/30/79.

10. That, the Plaintiff was illegally apprehended, arrested,
confined and surrendered to the MPA **without probable cause**
on Fort Devens by the Defendant through the CID Agents, and
the Provost Marshal at:

(a). 1820 Hours on 2/13/79, or;

(b). at sometime on 2/13/79.


11. That, the Plaintiff underwent the second longest probable
cause hearing in the judicial history of Massachusetts which
was 12½ days long, and received testimony from 45-50 witnesses,
before Judge James Killiam III.


12. That, Judge Killiam **found no probable cause** against the
Plaintiff on the charge of Murder in the First Degree, G.L.c.

9

265, §1, and the Plaintiff was secretly indicted for that crime.

13. That, the Plaintiff stood trial in February 1980, and was
convicted solely on the charge of Murder, G.L.c. 265, §1.

14. That, having submitted a full post conviction appeal the
SJC found that the actual date of the Plaintiffs arrest to be
2/14/79.

15. That, the date of **February 14, 1979** was never challenged
by the Defendant, who used the same SJC opinion above at ¶¶7
as grounds to discharge the Plaintiff from the USA in October
1982.

16. That, the SJC opinion above at ¶¶7 has never been challenged
by the Defendant, the MPA, nor any individual in the State of
Massachusetts as being inaccurate on the actual date of the
Plaintiffs arrest, and as such have waived their right to
raise any challenge to that date of 2/14/79 at this time.

17. That, in June 2003, for the first time, counsel for the
Plaintiff in another case questioned the Plaintiff about the
date and time of his arrest leading the Plaintiff to discover
the date of **February 14, 1979**, as being the actual date the SJC
found the Plaintiff to be apprehended and arrested on.

18. That, in June 2003, twenty-one years after the Plaintiff was
discharged in October 1982, the Plaintiff immediately notified
the Defendant through the Judge Advocate General, (JAG), of
the date of the arrest being 2/14/79, see attached **EXHIBIT-1**,
which was served via U.S. Certified Mail, see attached **EXHIBIT-2**,
and the **lack of probable cause to arrest the Plaintiff on 2/13/79.**

19. That, upon receipt of Exhibit-1, the JAG:

    (a). **did nothing to enforce the UCMJ, or any of the
other legal authorities found above at ¶¶1**;

    (b). failed to even respond to the Plaintiff to
acknowledge receipt of Exhibit-1.

20. That, when the JAG failed to respond at all, or even levy
Court-Martial charges against those that apprehended, arrested,
confined, and surrendered the Plaintiff to the MPA on 2/13/79,
the Plaintiff then contacted the USA Inspector General, **see
attached EXHIBIT-3**, which requested the Inspector General, (IG),
to investigate the entire matter, including the failure of the
JAG to investigate and enforce the UCMJ.

21. That, the IG notified the Plaintiff by letter **see attached
EXHIBIT-4**, that the IG would do nothing, since the JAG was
better qualified to handle legal matters.

22. That, the Plaintiff then sent the entire matter via the

11

U.S. Mail to the Secretary of the Army, **see attached EXHIBIT-5,** and the Secretary of the Army failed to take any action what so ever to uphold the UCMJ, or any other legal authority cited within Exhibit-1.


23. That, following the events involving Exhibit(s) 1-5, the Plaintiff did in April, and again in May 2004, file a timely FTCA Claim **Standard Form 95 (Rev. 7-85),** to the USA, Attn: Chief, Tort Branch, 4411 Llewellyn Avenue, Ft. Meade, MD., 20755-5360, in which the following claims were brought to the attention of the USA for review and decision:

(a). 28 USC, §2671, FTCA: the Defendant did **without probable cause** apprehend, arrest, confine, and surrender the Plaintiff to the MPA on 2/13/79 at 1820 Hours (or at anytime on 2/13/79) resulting in the false arrest and confinement of the Plaintiff leading to intentional infliction of emotional distress which can be litigate pursuant to 28 USC, §2671 et seq., through the ruling of **Gross** v. **U.S.,** 676 F.2d 295 (8th Cir. 1982). The Plaintiff alleges that this claim #1 is a continuing tort which originated on 2/13/79, and is ongoing;

(b). 28 USC, §2671, FTCA: the Defendant did **without probable cause** apprehend, arrest, confine, and surrender the Plaintiff to the MPA on 2/13/79 at 1820 Hours (or at anytime on 2/13/79), resulting in the false arrest and confinement of the Plaintiff leading to loss of consortium which can litigated pursuant to 28 USC, §2671 et seq., through the ruling of

12

**Davis** v. **U.S.**, 834 F.Supp. 517 (D. Mass 1993), allowing for

monetary damages when the U.S. government or its agencies

interfere with financial, marital, or business partnerships

and cause the citizen injury. The Plaintiff alleges that this

claim #2 is a continuing tort which originated on 2/13/79, and

is ongoing;

   **(c).** 28 USC, §2671, FTCA: the Defendant did beginning

in June 2003, fail to investigate and enforce the alleged

violations of the UCMJ set out within Exhibit(s) 1-5, and

in doing so did create intentional infliction of emotional

distress under the ruling of **Gross** v. **U.S.**, supra. The Plaintiff

alleges that this claim #3 is a FTCA originating in June 2003,

and is ongoing;

   **(d).** 28 USC, §2671, FTCA: the Defendant did beginning

in June 2003, fail to investigate and enforce the alleged

violations of the UCMJ set out within Exhibit(s) 1-5, and

in doing so did subject the Plaintiff to loss of consortium

with the Plaintiffs second wife Rhonda Lyles, leading to

a breakdown of that second marriage; leading to loss of

financial opportunities and business partnerships. The Plaintiff

alleges that this claim #4 is a FTCA originating in June 2003,

and is ongoing;

   **(e).** 5 USC, §552a, **Privacy Act:** the Defendant did

beginning in June 2003, after being put on notice of the error

on the date and time of the Plaintiffs apprehension, arrest,

confinement and surrender to the MPA on 2/13/79, at 1820 Hours

13

(or any time on 2/13/79), did fail to correct USA Records,
inclusive of the USA 201 Personnel File of the Plaintiff,
and maintain those USA Records in a accurate, relevent, timely,
and complete manner, injuring the Plaintiff through the
failure to maintain the  USA Records appropriately. The Plaintiff
alleges that this claim #5 is a Privacy Act violation originating
in June 2003, and is ongoing denying the Plaintiff accurate
USA Records that the Plaintiff would use to establish his
arrest was false leading to the false imprisonment;

(f). 44 USC, §2201, FRA: the Defendant did beginning
in June 2003, after being put on notice of the error on the
date and time of the Plaintiffs apprehension, arrest, confinement,
and surrender to the MPA on 2/13/79, at 1820 Hours (or any time
on 2/13/79), did fail to correct the USA Records, inclusive
of the USA 201 Personnel File of the Plaintiff, and maintain
those USA Records in a accurate, relevent, timely, and complete
manner, injuring the Plaintiff who would use the USA Records
to establish his arrest was false leading to false imprisonment.
The Plaintiff alleges that this claim #6 is an FRA violation
originating in June 2003, and is ongoing.


24. That, pursuant to **Rodriquez v. U.S.**, 54 F.3d 41 (1st Cir.
1995):

> "...Under statutory waiver of sovereign immunity
> United States can be held liable for false arrest
> of Plaintiff in same manner and to same extent as
> private individual would be in like circumstances
> under applicable state law..."

14

25. That, pursuant to **Sietins v. Joseph**, 238 F. Supp. 366 (D. Mass. 2003), false imprisonment consists of:

      **(a).** intentional;

      **(b).** and unjustified;

      **(c).** confinement of a person;

      **(d).** directly, or indirectly;

      **(e).** of which the person confined is conscious or

is harmed by such confinement.

26. That, Massachusetts General Law, Chapter 231, §94A states:

      **"...if a person authorized to make an arrest shall have probable cause...such probable cause shall be a defence in an action brought against him for false arrest or imprisonment..."**

27. That, pursuant to **Sietins**, under Massachusetts law officers may be liable for false imprisonment unless the officer had a legal justification for the restraint.

28. That, pursuant to **Sietins**, under Massachusetts law relating to false imprisonment, justification exists if the officer had **probable cause**.

29. That, the Plaintiff can show that after being notified in June 2003 of the error in USA Records and **lack of probable cause** on 2/13/79, at 1820 Hours to apprehend, arrest, confine, and surrender the Plaintiff to the MPA, the Defendant did nothing.

15

**30.** That, the Defendant had no discretion in failing to enforce the UCMJ and by failing to do so has left the Defendant open for judicial review by this USDC.

**31.** That, based on the inaction of the Defendant after being served with Exhibit(s) 1-5, the Plaintiff can show that:

   **(a).** Defendant intended to restrain and apprehend the Plaintiff at 1820 Hours on 2/13/79, (or at any other time on 2/13/79), and restrain the Plaintiff from that point in time until now in violation of the legal authorities cited within ¶¶1 above;

   **(b).** the Defendant was unjustified in the apprehension, arrest/restraint, confinement, and surrender of the Plaintiff at 1820 Hours on 2/13/79, (or at any other time on 2/13/79);

   **(c).** the Defendant continued to allow the Plaintiff to remain incarcerated from June 2003, to the current time, knowing that there was a judicial ruling by the SJC which proved the actual date of the arrest of the Plaintiff to be on **2/14/79, not 2/13/79**;

   **(d).** the Defendant <u>directly</u> (through inaction on their own part), and <u>indirectly</u> (by allowing Exhibit(s) 1-5 to remain in the custody of the Defendant instead of sending these Exhibits to the Massachusetts State Attorney General and demanding an answer for the finding of the SJC decision above at ¶¶7), continued the false arrest and imprisonment of the Plaintiff from 2/13/79, to the current time;

16

(e). the Plaintiff first became aware and conscious
of an actionable claim and the specific harm that claim had
caused the Plaintiff in two ways:

(1). in June 2003 when it occurred to the
Plaintiff that his arrest on 2/13/79, at 1820 Hours (or at
any time on 2/13/79), was **without probable cause**, it also
became known to the Plaintiff that the Defendant had violated
not only the UCMJ, but also the other legal authorities set
out above at ¶¶1;

(2). in June 2003 after the discovery of the SJC
decision which listed the actual date of the Plaintiff's
arrest and confine to be **2/14/79**, the Plaintiff took the time
and notified the Defendant of the date of 2/14/79, through
the Exhibit(s) 1-5, and when the Defendant did nothing to
investigate nor correct the problem in Exhibit-1, it occurred
to the Plaintiff that the overall goal of the Defendant since
2/13/79, had been to violate the UCMJ, and deliver the Plaintiff
to the MPA at any cost.


32. That, the Defendant intentionally, or unintentionally,
through negligence refused to investigate the violations of
the UCMJ set out in Exhibit(s) 1-5:

(a). because the Defendant knew that on 2/13/79, at
1820 Hours (or at any time on 2/13/79), the USA **lacked**
**probable cause** to justify the apprehension, arrest, and
confinement of the Plaintiff in a USA stockade, or a civilian
prison;

17

        **(b).** because the Defendant became aware through the
Exhibit(s) 1-5, that the Plaintiff was conscious as to the
**lack of probable cause** existing on 2/13/79, at 1820 Hours,
(or at any time on 2/13/79), and refused to investigate the
matter as the Defendant knew the USA had committed numerous
violations of the UCMJ.


32. That, this is a continuing tort due to:

        **(a).** the authority of the USA, and the USA CID to
apprehend, arrest, confine, and surrender the Plaintiff to
the MPA at 1820 Hours on 2/13/79 is in question as set out
above at ¶¶ 5-8 raising the question pursuant to Article 9(d),
of the UCMJ, if **probable cause** existed, and whether or not the
civilian MPA currently have lawful jurisdiction over the
Plaintiff twenty five years later in 2004;

        **(b).** if the MPA gained jurisdiction over the Plaintiff
by misleading the Defendant, or by fraud, then the Plaintiff
was prematurely, and unlawfully discharged from the USA in
violation of Article(s) 11, 84, 107, 134, 138 and as such,
the Plaintiff would still technically be in the USA;

        **(c).** the Defendant USA CID took an active part in
the apprehension, arrest, and confinement of the Plaintiff
on 2/13/79, at 1820 Hours, while at the sametime, the USA CID
ignored the rights of the Plaintiff guaranteed by the UCMJ,
and that refusal to uphold the right of the Plaintiff pursuant
to the UCMJ continues as of the date of this Civil Action.

18

**33.** That, the Defendant retains the single authority to reinvoke the jurisdiction of the USA over the Plaintiff pursuant to Article 3 of the UCMJ:

    **(a).** as the apprehension, arrest, confinement, and surrender of the Plaintiff to MPA on 2/13/79, at 1820 Hours is clearly shown to have occurred **without probable cause**;

    **(b).** federal law pursuant to the UCMJ would preempt Massachusetts state law, and in the absence of **probable cause,** Article 9(d) would control the situation and mandate that the Plaintiff be returned to the USA since **no probable cause** existed on 2/13/79, at 1820 Hours, for the apprehension, arrest, confinement, and surrender.

**34.** That, the USDC has ruled in **Wright v. U.S.**, 963 F. Supp. 7 (D.D.C. 1997), the existence of **probable cause** would serve as grounds to deny a claim brought under 28 USC, §2671 Et seq., for false arrest and imprisonment.

**35.** That, pursuant to Article 134 of the UCMJ, listed above in ¶¶1, and Article 138, the Defendant was placed on NOTICE and had no choice but to acknowledge that the Plaintiff had:

    **(a).** clearly defined several violations of the UCMJ;

    **(b).** raised the distinct probability that the MPA defrauded the USA on 2/13/79, at 1820 Hours when the MPA claimed **probable cause** existed which is contrary to the

19

civilian SJC decision above at ¶¶7 outlining that **probable cause** for the arrest of the Plaintiff didn't actually exist until 2/14/79;

 **(c)**. clearly outlined that the military decision making process that apprehended, arrested, confined, and surrendered the Plaintiff to the MPA on 2/13/79, at 1820 Hours was misinformed, flawed, and more than likely relied upon the MPA which probably defrauded the Defendant;

 **(d)**. clearly outlined that military effectiveness was specifically impacted by the MPA who probably defrauded the Defendant USA and caused the Defendant to apprehend, arrest, confine, and surrender the Plaintiff to the MPA on 2/13/79, at 1820 Hours when **probable cause did not exist**;

 **(e)**. **clearly** outlined the state of confusion that surrounded the events of 2/13/79 and 2/14/79.

**36.** That, the majority of the MPA that sought the arrest of the Plaintiff on 2/13/79, at 1820 Hours have since 2/13/79, been arrested and charged with felonies themselves.

**37.** That, Chief William Adamson, and his son, William Adamson, Jr., of the Ayer Police Department, (APD), Ayer, Massachusetts, who headed and investigated the murder of the Plaintiff's wife were subsequently arrested, or forced to resign from the APD between 1982-1984, after it was discovered that:

**(a).** Chief Adamson covered up a major felony that involved the APD officers inclusive of his son, Officer William Adamson, Jr.;

**(b).** Chief Adamson went as far in his cover up as to attempt a "frame up" of APD Officer Stan Randell who **"uncovered"** the felony involving the other APD officers and when Officer Randell attempted to report the felony involving APD police officers, Chief Adamson framed Officer Randell for a rape that never occurred, and which was dismissed in state criminal court, see attached **EXHIBIT-6**, (newsclippings of these events);

**(c).** Officer William Adamson Jr., had led the other APD officers in the felony that his father, Chief Adamson had attempted to cover up.

38. That, the APD attempted to frame APD Officer Randell after he reported the felony involving the other APD officers and would not hesitate to "frame" the Plaintiff or mislead and defraud the USA in order to bring about the arrest of the Plaintiff, and subsequent closure on the murder investigation of the Plaintiff's wife.

39. That, the Plaintiff is actually innocent of the sole charge of Murder, G.L.c. 265, §1, for which the Plaintiff has been incarcerated since 1979, and can prove it, **see attached EXHIBIT-7.**

21

**40.** That, this is not a 2254 (USDC) Habeas Corpus Petition.

**41.** That, the so called **Feres Doctrine** does not apply to the facts in this case the Plaintiff alleges for the following reasons:

(a). the relationship between the USA and the Plaintiff extended no further than the mandated Articles of the UCMJ which subjected the Plaintiff to the ultimate control of the USA;

(b). following the decision in **Feres**, non-military courts have observed the importance of military discipline which is unreviewable by non-military court which has been accepted due to the importance of the UCMJ which governs the USA-Defendant and which required the USA to adhere to the UMCJ;

(c). this case is not barred by **Feres**, as the complained of conduct of the Defendant reflected by the prima facia showing above at ¶¶5-8 clearly indicating that the Defendant failed intentionally, or unintentionally, to adhere to, and equally dispense the protection of the Articles of the UCMJ in the case of the Plaintiff which would now render the actions of the Defendant reviewable by this USDC;

(d). the questionable conduct of the Defendant was presented directly to the JAG, IG, and Secretary of the Army who failed to equally apply the protection of the UCMJ in June 2003, in the Plaintiff's case which gave rise to a separate claim;

(e). where the Defendant has seen fit to deny the

22

Plaintiff the equal protection of the UCMJ on 2/13/79, at 1820
Hours; or on 2/13/79 altogether; or from 1979 to June 2003; or
from June 2003 until the current time two specific facts germain
to this denial are alleged:

      (1). Defendant denied the Plaintiff equal protection
of the UCMJ because the **civilian** murder occurred off of Fort
Devens, in the **civilian** community, with **civilian** police forming
the lead investigative authority with the USA CID acting in a
secondary role, and no military job description of the Plaintiff,
nor military discipline was directly involved;

      (2). Defendant denied the Plaintiff equal protection
of the UCMJ as alleged due to the fact that the **civilian** murder
in the **civilian** community did not arise from, or in the course
of **incident to service** of the role of the Plaintiff in the USA,
(e.g., generally **Chatman v. Hernandez**, 805 F.2d 453 (1st Cir. 1986);

      **(f)**. the physical act of surrendering the Plaintiff
to the MPA on 2/13/79, at 1820 Hours, reflects the **civilian**
murder, and subsequent apprehension, arrest, confinement of
the Plaintiff were not **incident to the role the Plaintiff served
in the USA if it had been the USA would have retained the Plaintiff
and charged him with Murder before a USA Court-Martial;**

42. That, adjudication of this action in the USDC is required
due to the following facts alleged by the Plaintiff which reflect
further that **Feres Doctrine** is inappliable in this case:

      **(a)**. the USDC is needed to determine the status of

23

the Plaintiff:

(1). if the Plaintiff is still in the USA as
alleged above at ¶¶5-8; ¶¶16; ¶¶32-33, then the **Feres Doctrine**
would be in effect;

(2).  if the Plaintiff is not in the USA at
this time, the **Feres** **Doctrine** would not apply due to the facts
alleged within this Civil Action;

(b). a conflict in state (SJC) and federal (USA)
jurisdiction is seen at ¶¶5-8 above which requires this USDC
to review and rule upon;

(c). the court of jurisdiction (the SJC) has rendered
a decision at ¶¶7 above, which conflicts with USA actions,
and USA documents or records;

(d). without **probable cause** on 2/13/79 at 1820 Hours,
the **civilian** MPA entered onto Fort Devens, a federal reservation
and contrary to the UCMJ illegally seized, falsely arrested
and imprisoned the Plaintiff, a federally protected (soldier)
citizen;

(e). **Feres Doctrine** was created to keep non-military
courts out of military decision making that would impact
military effectiveness and discipline but in this case the
**lack of probable cause** on 2/13/79 at 1820 Hours requires the
USDC to review this case to determine if the UCMJ, and other
legal authorities at ¶¶1 above were violated;

(f). **after being alerted** to the problem in June 2003,
by Exhibit(s) 1-5, the Defendant undetook no corrective action

24

to ensure and uphold federal sovereignty;

   (g). the military effectiveness and discipline (forcing the Defendant to adhere and dispense the UCMJ) in the USA would be greatly enhanced by the USDC reviewing this case and rendering directions as required;

   (h). with a 24 hour gap in the case of the Plaintiff between 2/13/79 at 1820 Hours when the Plaintiff was illegally apprehended, arrested, confined, and surrendered to the MPA, and the date of 2/14/79, that the SJC ruled as the actual date of the Plaintiff's arrest, a mockery of military effectiveness and discipline is seen which requires the USDC to take jurisdiction of this case and ferret out the facts;

   (i). the Defendant cannot be heard to invoke the **Feres Doctrine** given the ineffective actions of the USA todate which include at the very least the inability to determine the actual time and date of key events going on around and within it (such as the arrest of one of its soldiers); or the whereabouts of one of its soldiers (the SJC ruled the Plaintiff was still in the USA until 2/14/79 and the USA claimed the Plaintiff was gone on 2/13/79 at 1820 Hours when the MPA took custody of the Plaintiff); or the inability of the USA to maintain accurate, timely, relevant and complete records; or the inability of the USA to investigate violations of it's own UCMJ brought to the attention of the USA through Exhibit-1.

**CAUSE OF ACTION**

25

**43.** That, the Plaintiff realleges ¶¶1-42 as the cause of this action.

**44.** That, the actions, inactions, and omissions of the Defendant are the direct proximate cause of the injuries sustained by the Plaintiff which include:

(a). illegal false arrest and confinement since 2/13/79;

(b). intentional infliction of emotional distress;

(c). loss of consortium: with immediate family members, still living, and with parents who have died while the Plaintiff was incarcerated; with daughter who grew up without a father; with second wife Rhonda Lyles who married the Plaintiff in 1989; with friends that had planned a business together; through lost financial opportunities;

(d). a failure to maintain accurate, timely, relevant, and complete records that would have helped the Plaintiff prove his case before this USDC.

**45.** That, the Plaintiff has stated an actual controversy that exists between the parties that the USA will not investigate, and which requires the determination of this USDC as to the rights of the parties involved, as no other adequate, or available remedy exists.

## LEGAL CLAIMS

**LEGAL CLAIM #1:**

**46.** That, the Defendant did through ¶¶1 to ¶¶45 violate state and federal law, and constitutional provisions.

**47.** That, the Plaintiff realleges ¶¶23(a), infliction of intentional emotional distress in this alleged continuing tort.

**48.** That, the Defendant violated:

(a). state law at G.L.c. 218, §1 Et seq; G.L.c. 231, §94(a); G.L.c. 276, § 1Et seq;

(b). federal law at UCMJ; 28 USC, §2671;

(c). U.S. Constition at:

(1). 1st Amendment: denial of association;

(2). 4th Amendment: illegal false arrest and imprisonment without probable cause on 2/13/79 at 1820 Hours;

(3). 5th Amendment: denial of due process; lack of probable cause; indictment as result of false arrest absent probable cause on 2/13/79 at 1820 Hours;

(4). 6th Amendment: criminal trial based on false arrest at 1820 Hours on 2/13/79;

(5). 8th Amendment: illegal arrest at 1820 Hours on 2/13/79 leading to false imprisonment - infliction of intentional emotional distress and loss of consortium;

(6). 8th Amendment: refusal of Defendant to investigate and enforce UCMJ since June 2003 - infliction of

intentional emotional distress and loss of consortium;

(7). 14th Amendment: illegal false arrest and imprisonment; denial of due process; denial of equal protection of cited legal authorities within.

**LEGAL CLAIM #2:**

49. That, the Plaintiff realleges ¶¶46.

50. That, the Plaintiff realleges ¶¶23(b), loss of consortium in this alleged continuing tort.

51. That, the Plaintiff realleges ¶¶48(a)(b)(c)(1)(2)(3)(4)(5) and (7).

**LEGAL CLAIM #3:**

52. That, the Plaintiff realleges ¶¶46.

53. That, the Plaintiff realleges ¶¶23(c), intentional infliction of emotional distress in FTCA since June 2003.

54. That, the Plaintiff realleges ¶¶48(a)(b)(c)(1)(2)(3)(4)(6) and (7).

**LEGAL CLAIM #4:**

55. That, the Plaintiff realleges ¶¶46.

56. That, the Plaintiff realleges ¶¶23(d), loss of consortium, in FTCA since June 2003.

57. That, the Plaintiff realleges 48(a)(b)(c)(1)(2)(3)(4)(6) and (7).

**LEGAL CLAIM #5:**

58. That, the Plaintiff realleges ¶¶46.

59. That, the Plaintiff realleges ¶¶23(e), intentional infliction of emotional distress and loss of consortium through violation of Privacy Act since June 2003.

60. That, the Plaintiff realleges ¶¶48(a)(b)(c)(1)(2)(3)(4)(6) and (7).

**LEGAL CLAIM #6:**

61. That, the Plaintiff realleges ¶¶46.

62. That, the Plaintiff realleges 23(f), intentional infliction of emotional distress and loss of consortium through violation of FRA since June 2003.

63. That, the Plaintiff realleges ¶¶48(a)(b)(c)(1)(2)(3)(4)(6) and (7).

## RELIEF SOUGHT

**64.** Declare the rights of the parties.

**65.** Order that the **USA DA Form 4187 1 May 74** bearing the time and date of 2/13/79 at 1820 Hours when the Plaintiff was surrendered to the MPA be provided to the Plaintiff immediately.

**66.** Damages in the amount of $25,000,000.oo for injuries suffered by the Plaintiff:

   **(a).** either for the continuing tort from 1979 to June 2003;

   **(b).** or for injuries sustained by the Plaintiff since June 2003.

**67.** Trial by jury on all issue's triable and whatever greater or further relief the USDC deems in the interest of justice.

## VERIFICATION

I, William M. Tyree, on oath state that all documents attached to this Civil Action at Exhibit-1 through Exhibit-7, are true genuine copies of the documents that they purport to be and I sign this to the best of my knowledge, under the pains and the penalties of perjury on the below date:

*William M. Tyree*                    Date: 6-11-04
William M. Tyree
Pro se
P.O. Box-100
S. Walpole, MA. 02071

```
┌─────────────────────┐
│     EXHIBIT         │
│                     │
│        1            │
│                     │
└─────────────────────┘
```

I, William M. Tyree, on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, 6-11-04.

_William M. Tyree_

William M. Tyree, P.O. Box 100,
S. Walpole, Massachusetts, 02071

June 9, 2003


Department of the Army
**Attn: The Judge Advocate General
      of the United States Army**
The Pentagon
Washington, D.C. 20310


RE: **Fraud Perpetrated Against The U.S. Army
    By Civilian Police Officers In A Capital
    Murder Of A U.S. Army Soldier.**


Dear sir,

       Greetings and well done in Iraq! Airborne. My name is
William M. Tyree. My last duty assignment was the 441st Military
Intelligence Detachment, 10th Special Forces Group, Airborne,
(SFG(A), Fort Devens, Massachusetts, 1979.

According to available documents the Army released me into the
custody of the Ayer Police Department, Ayer, Massachusetts, on
February 13, 1979, (2/13/79), for the murder of my wife, PFC
Elaine A. Tyree. **n.1/**

According to the Massachusetts Supreme Judicial Court, (SJC), the
highest state court, the SJC found that I was actually arrested
on February 14, 1979. **n.2/**

**Needless to say** if the Army released me prior to the existence
of verified probable cause we have a violation of the UCMJ at
several Articles. **n.3/**

After consulting with my attorney the flaw in the published SJC
opinion was brought to my attention. In Massachusetts, such a
flaw must be noticed by the court of jurisdiction **at any time**
because it impacts on the jurisdiction of that court to hear
the matter. **n.4/**

Page two
Letter To SJA


As near as my attorney and I can decipher, the Army has not less
than four major problems with the SJC decision. **Please keep in
mind that my case has drawn national and international attention
through the documentary broadcast off and on since June 1998 on
the "Arts & Entertainment" (A&E) Channel. n.5/**

The four problems that scream for attention and explanation are:

**Problem #1:**

Since the SJC established that probable cause (PC) didn't exist
for my arrest until 2/14/79, when I was arrested at the CID Field
Office on Fort Devens, **how** and **why** did the Army release me to the
civilian police on 2/13/79?

**Problem #2:**

If the arrest date of 2/14/79 is wrong how could the SJC have
adequately reviewed and affirmed my conviction?  (Lets face it,
if the five justices of the SJC and their combined clerks did
make a mistake of this magnitude how can their decision be taken
seriously in light of the error on the date of the arrest? Keep
in mind that the SJC said, "The next afternoon, **Wednesday,
February 14.**"  That is a far cry from **"Tuesday, February 13).**

**Problem #3:**

In the past $24\frac{1}{2}$ years since the murder occurred and I became
incarcerated, this case has went to the SJC not less than two
dozen times resulting in two published opinions; it has went to
the U.S. District Court and U.S. Court of Appeals, (Federal
Habeas Post Conviction attack), three times; and the U.S. Supreme
Court twice. In that period of time the Commonwealth of
Massachusetts has never challenged the date of arrest on 2/14/79
in the SJC published opinion. In that period of time the U.S.
Army has never challenged the SJC published opinion on the date
of arrest either: and the Army has been to court with me not less
than three times (1980 trial; 1986 New Criminal Trial Motion
(denied); and Tyree v. U.S. Army, USDC, Washington, D.C.). In
short, all the lawyers have never challenged the date of the
arrest which certainly could be argued as waived by those same
lawyers at this point in time.  The third problem is after 24
years no one has ever denied that date as the true date of my
arrest.To argue it now would require the U.S. Army to claim that
it has jurisdiction due to fraud being perpetrated on it by the
civilian authorities in the case. How else could the Army explain
why it accepted the word of the police and released me prior to
the date and time that probable cause existed.

Page three
Letter To SJA

## Problem #4:

Upon consideration of the date of the arrest in the SJC opinion
of 2/14/79, and the date of my **arrest** according to the Army as
2/13/79, which such a conflicting set of dates in a capital case
that impacted the civilian-military jurisdictions, **how could the
U.S. Army rely upon the SJC opinion that confirmed my conviction
and use that SJC opinion as grounds to bring about and support
my discharge from the U.S. Army?**    (I would also point out two
other facts relevant to this problem: (a). Judge James Killiam
III, found no probable cause to bind me over for trial on the
exact crime I have been incarcerated for since 1979. His written
decision of two pages dated May 15, 1979, came about after a
$12\frac{1}{2}$ day hearing and testimony from 45-50 witnesses; (b). after
my conviction even the U.S. Army Discharge Board (acutely aware
that I was being railroaded) handed down a "General Discharge
Under Honorable Conditions." The conviction was highly debated
among Fort Devens personnel for years after it occurred).


There are four problems that arise from the difference in the
SJC date of 2/14/79 and 2/13/79. Consider another problem that
would make most hard core judges cringe. With such a difference
in the dates, (a full 24 hours), I can honestly state that I was
never given my rights under Miranda v. Arizona or Article 31,
and since I was arrested on Fort Devens the U.S. Army had no
choice but to administer Article 31 rights before any questioning
occurred.

I have filed this request for investigation and review with the
SJA, and have under separate cover requested a Congressional
Investigation through my state Senator, John F. Kerry (D-Mass).
I have done this for several reasons. The three major reasons
are:

        1. prior to the murder of my wife, we contacted the
U.S. Senator from Utah, E.J. "Jake" Garn (my home of record),
and requested that he direct the Army to investigate threats
to our lifes that we had received. Senator Garn tendered a
notarized letter in 1983 (enclosed) which outlined the Army had
the time to investigate the threats, (six weeks before the
murder) and did nothing! Could this negligence be the motive
for the Army's error on the date of my arrest?n.6/;
        2. Senator Kerry has received numerous documents and
testimony that put me in the middle of activities in the U.S.
Army that the Army denies took place: the Senator is aware that
this case reaks of a cover up. Even Judge Killiam used the word
"frame.";

Page four
Letter To SJA


       3. Senator Kerry has a duel state and federal interest
in this case. He is the U.S. Senator from Massachusetts and is
acutely aware that the justices of the SJC would never make a
mistake as to the true date of my arrest. He is also acutely
aware (as both a Senator and ex-Naval Officer/Vietnam Veteran),
that absent true probable cause, I could never have been released
from Army-federal control on 2/13/79. So he has a true state and
federal conundrum on his hands that he has a right to have an
answer to.

In this letter I:

       4. claim a violation of the UCMJ;
       5. claim a violation of the U.S. Constitution at the
4th (illegal seizure of person w/no probable cause); 5th (due
process denial; indictment based on false arrest without probable
cause); 6th (trial based upon 2/13/79 date in part); 8th (ongoing
$24\frac{1}{2}$ year incarceration-cruel and unusual punishment); 14th (denial
of due process and equal protection). These Amendments were and
are still being violated due to the controversy on the date of my
arrest;
       6. claim the true date of my arrest is 2/14/79;
       7. claim the U.S. Army lacked authority absent probable
cause acknowledged by the SJC opinion to release me into the
custody of the civilian police on 2/13/79;
       8. claim the civilian police perpetrated a fraud on the
U.S. Army by claiming that probable cause existed on 2/13/79 for
my arrest, when in fact, the SJC opinion outlines that the true
probable cause and arrest didn't occur until 2/14/79;
       9. claim that every single U.S. Army document that bears
the date of 2/13/79 as my arrest date, is false and in violation
o Article 107 of the UCMJ;
       10. claim the discharge resulting from my civilian
conviction is invalid due to the difference in the date of my
arrest which the Army claims occurred on 2/13/79, and in which
the SJC found after a trial and appeal that the arrest occurred
on 2/14/79. Since the discharge is invalid, I am still in the
U.S. Army, or should be returned to U.S. Army status pending
a Court of Inquiry convened pursuant to Article(s) 135 and
Article 3.

In this letter I make a formal request for:
                                  n.7/
       11. a Court of Inquiry to be convened to look into the
following and make a specific finding on:

Page five
Letter To SJA

      (a). the actual date of my arrest;

      (b). the course of action required to correct the SJC opinion if it is found to be in error: should an Order from a U.S. District Court be sought to correct the date (or to acknowledge it by the Army), or should a hearing in the Massachusetts Superior Court (of jurisdiction in Middlesex County, Massachusetts), be sought and held attended by all relevant parties;

      (c). whether or not I am in the U.S. Army and have been for the past $24\frac{1}{2}$ years due to the error of the date of my arrest;

      (d). whether or not the date and time of my true arrest found by the Court of Inquiry will have any impact on my conviction and ongoing incarceration (it could be determined that I was truly arrested on 2/14/79, or perhaps earlier than previously known on 2/13/79 when no probable cause existed), if that is found, then the Court of Inquiry must make a determination as to whether or not any of the findings made by the Court of Inquiry impact and or nullify my conviction. In short, there is no way to determine at this point where this will go and the Court of Inquiry should have the authority to **identify** whatever problems may be found to exist which stem directly from the date and time of the arrest, and make recommendations on how to correct them);

      (e). reinstatement in the U.S. Army with time served incarcerated credited towards retirement and benefits. <u>I DO NOT REQUEST DAMAGES UNDER 42 USCA, §1983;</u>

      (f). pursuant to Article 11 of the UCMJ I make a formal request for all MP, MPI, CID documents related to my arrest. I also make a formal request for the DD Form 4187 1 May 74 (edition) from the date of my arrest which should have been signed off on by Cpt. Erik K. Polcrack, INF, Commanding, Service Company, 10th SFG(A). This document should bear the time and date of my arrest which is the central document conflicting with the SJC opinion.

I would also point out that normally where federal law preempts state law through the Federal Supremacy Clause, in this case the Army waived jurisdiction and surrendered me to the civilian police. Through that act alone, the Army would need to correct the issue of the difference in the dates of arrest, as the Army may have been suckered into waiving jurisdiction and that would account for the difference in the dates of arrest; <u>further,</u> the Army had primary jurisdiction over me. If the case the civilian police had was flawed to the point of a difference in the date of the arrest by a full 24 hour period, I would bet the Officer who released me from Army custody would have liked to have known that information before he let me go; <u>further</u> until the Army reasserts its jurisdiction over **my person,** the state SJC

Page six
Letter To SJA

opinion is the controlling legal authority. The SJC opinion
clearly reflects that on 2/13/79 (when the Army surrendered me
to the civilian police) no probable cause existed.

In closing I look forward to hearing from the SJA on this matter
as soon as possible and would request a date for the Court of
Inquiry to convene immediately for obvious reasons.

This letter exhausts the administrative avenues available to me
within the U.S. Army.

Thank you for your time and asssiatnce in this matter. Airborne!

Respectfully submitted,

William M. Tyree
P.O. Box-100
S. Walpole, MA. 02071


cc: Senator John F. Kerry
    Attorney Raymond D. Kohlman, Ph.d
    file



n.1/ see DD-214, Box-29 citing lost time that begin on "790213."
     Attached **Exhibit-A.**

n.2/ see Commonwealth v. Tyree, 387 Mass. 191, 203-204 (1982).
     Attached **Exhibit-B.**

n.3/ see Article 7, Article 9 Apprehension and Arrest without
     probable cause after false reports were tendered in violation
     of Article 11 and Article 107 which led to unlawful discharge
     of my person in violation of Article 84.

n.4/ see Massachusetts General Law, Chapter 277, §47A. Attached
     **Exhibit-C.**

n.5/ see T.V. Guide page for schedule of documentary being shown.
     Attached **Exhibit-D.**

Page Seven
Letter To SJA

<u>n.6</u>/ see Sworn Statement of Senator Garn. Attached **Exhibit-E.**

<u>n.7</u>/ A Court Of Inquiry could:

> (A). marshall the facts to determine what course of action
> should be taken;
> (B). investigate to determine what the true date of arrest
> is;
> (C). make recommendations as to how to correct the date of
> arrest is that is required;
> (D). provide a solid record to give the civilian court at
> in a civilian evidentiary hearing;
> (E). determine if it is in the best interest of the service
> and the good of the public to take the prosecution
> against me any further.

military authorities, and habeas corpus to discharge him from such custody will not lie.  Huff v. Watson, Ga.1919, 99 S.E. 307, 149 Ga. 139.

**11.  Parole**

That paroled prisoner was surrendered to federal authorities for desertion did not discharge him from penitentiary, and parole commission could subsequently revoke parole and return him to penitentiary without charges and hearing.  People ex rel. Hannon v. Warden of Penitentiary of New York County, N.Y.A.D. 1 Dept. 1924, 205 N.Y.S. 235, 209 A.D. 521.

## § 809.  Art. 9.  Imposition of restraint

(a) Arrest is the restraint of a person by an order, not imposed as a punishment for an offense, directing him to remain within certain specified limits.  Confinement is the physical restraint of a person.

(b) An enlisted member may be ordered into arrest or confinement by any commissioned officer by an order, oral or written, delivered in person or through other persons subject to this chapter.  A commanding officer may authorize warrant officers, petty officers, or noncommissioned officers to order enlisted members of his command or subject to his authority into arrest or confinement.

(c) A commissioned officer, a warrant officer, or a civilian subject to this chapter or to trial thereunder may be ordered into arrest or confinement only by a commanding officer to whose authority he is subject, by an order, oral or written, delivered in person or by another commissioned officer.  The authority to order such persons into arrest or confinement may not be delegated.

(d) No person may be ordered into arrest or confinement except for probable cause.

(e) Nothing in this article limits the authority of persons authorized to apprehend offenders to secure the custody of an alleged offender until proper authority may be notified.

(Aug. 10, 1956, c. 1041, 70A Stat. 40.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**
**1956 Acts**

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 809(a) . . . . . . . . . . . . . | 50:563(a). | May 5, 1950, ch. 169, § 1 (Art. 9), 64 Stat. 111. |
| 809(b) . . . . . . . . . . . . . | 50:563(b). | |
| 809(c) . . . . . . . . . . . . . | 50:563(c). | |
| 809(d) . . . . . . . . . . . . . | 50:563(d). | |
| 809(e) . . . . . . . . . . . . . | 50:563(e). | |

In subsection (b), the word "commissioned" is inserted before the word "officer" for clarity.  The words "member" and "members", respectively, are substituted for the words "person" and "persons".

| DD FORM 214 1 JUL 79 | PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE. | CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY | |
|---|---|---|---|

Case 1:04-cv-11430-RCL Document 1 Filed 06/23/2004 Page 39 of 112

| 1. NAME (Last, first, middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| TYREE, WILLIAM MURRAY JR | ARMY/RA | 528 | 96 | 6321 |

| 4a. GRADE, RATE OR RANK | 4b. PAY GRADE | 5. DATE OF BIRTH | 6. PLACE OF ENTRY INTO ACTIVE DUTY |
|---|---|---|---|
| PV1 | E1 | 580221 | SALT LAKE CITY UT |

| 7. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8. STATION WHERE SEPARATED |
|---|---|
| CO A USAPCF FT DIX NJ  TC | FORT DIX NJ  08640 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | |
|---|---|---|
| NA | AMOUNT $ 35 ,000 | ☐ NONE |

| 11. PRIMARY SPECIALTY NUMBER, TITLE AND YEARS AND MONTHS IN SPECIALTY (Additional specialty numbers and titles involving periods of one or more years) | 12. RECORD OF SERVICE | YEAR (s) | MON (s) | DAY (s) |
|---|---|---|---|---|
| | a. Date Entered AD This Period | 77 | 08 | 22 |
| P76P1P MAT CTL & ACTG SP 04 YRS 11 MOS | b. Separation Date This Period | 82 | 10 | 15 |
| | c. Net Active Service This Period | 01 | 05 | 21 |
| | d. Total Prior Active Service | 01 | 06 | 01 |
| | e. Total Prior Inactive Service | 00 | 02 | 02 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 79 | 01 | 05 |
| | i. Reserve Oblig. Term. Date | 00 | 00 | 00 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| ARMY SERVICE RIBBON |

| 14. MILITARY EDUCATION (Course Title, number weeks, and month and year completed) |
|---|
| STK CON * 8 WEEKS (7710) |

| 15. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM ☐ YES ☒ NO | 16. HIGH SCHOOL GRADUATE OR EQUIVALENT ☒ YES ☐ NO | 17. DAYS ACCRUED LEAVE PAID NONE |
|---|---|---|

| 18. REMARKS |
|---|
| CONTINUATION OF ITEM 14a  SUPMN  /NOTHING FOLLOWS/ |

EXHIBIT
A

| 19. MAILING ADDRESS AFTER SEPARATION | 20. MEMBER REQUESTS COPY 6 BE |
|---|---|
| 12913 S. 1800 W. RIVERTON, UT  84065 | SENT TO  UT  DIR. OF VET AFFAIRS  ☒ YES ☐ NO |

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. TYPED NAME, GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN |
|---|---|
| INDIVIDUAL NOT AVAILABLE FOR SIGNATURE | M. J. TETTERTON CW2 USA CHIEF SEP DIV |

**SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)**

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Includes upgrades) |
|---|---|
| DISCHARGE | UNDER HONORABLE CONDITIONS |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENLISTMENT CODE |
|---|---|---|
| CHAP 14 SEC II AR 635-200 | JKB | RE-4 |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| CIVILIAN CONVICTION |

| 29. DATES OF TIME LOST DURING THIS PERIOD | 30. MEMBER REQUESTS COPY 4 |
|---|---|
| 790213 TO: 821015 | INITIALS |

**JUMPS-ARMY**
**LEAVE AND EARNINGS STATEMENT**

| 1. NAME(LAST,FIRST,MI) | 2. UNIT ID CODE | INC.EAR.CODE | PAY GRADE | 4. PERIOD COVERED |
|---|---|---|---|---|
| TYREE WILLIAM M JR | H1CAAA | | E 4 | 01-31MAR79 |

| 3. SOC.SEC.NO. | NET PAY DUE → | | SUMMARY |
|---|---|---|---|
| 528 96 6321 V | NONE | | 9.AMT BROT. FWD. 13 |

**6.ENTITLEMENTS**

| TYPE | AMOUNT |
|---|---|
| MID-MONTH | 335.00 |
| ENDOFMONTH | 226.00 |
| FICA WAGES | 18.10 |

**7.ALLOTMENT COLLECTIONS**

| TYPE | AMOUNT |
|---|---|

**8.OTHER COLLECTIONS**

| TYPE | AMOUNT |
|---|---|
| SOLDIERHOM | .50 |
| SGLI | 3.00 |
| BASIC PAY | 413.82 |
| JUMP PAY | 40.33 |
| BAQ-OR/MR | 84.92 |
| CLOTHNGALW | 3.74 |
| SEP-RATS | 1.82 |
| FICA WAGES | 9.05 |

- 10.TOTAL ENT 57910
- 11.ALLOT COLLS
- 12.OTHER COLLS 557.18
- 13. NET EARN 2205
- 14.MID-MO PMT 281.00
- 15.END MO PMT NONE
- 16. AMT TO BE BROT FWD 905

| TOTALS | 579.10 | | | | 557.18 |
|---|---|---|---|---|---|

**TAX INFORMATION**

| 17. FED INC INS PERIOD | 18.FED INC YEAR TO DATE | 19.FED TAX YEAR TO DATE | 20.FED EX.REM | 21.FED ADD EX | 22.FICA WAGE TAX WHD | 23.FICA WAGE YEAR TO DATE | 24.FICA TAX YEAR TO DATE | 25.STATE EX.REM | 26.STATE ADD TAX WHD | 27.ST ADDS EX.REM |
|---|---|---|---|---|---|---|---|---|---|---|
| X | 105063 | 14104.5 | 1 | | | 98096 | 6013 | UTI | S 1 | |

**STATE TAX**

| 28.STATE INCOME YEAR TO DATE | 29.STATE TAX YEAR TO DATE |
|---|---|
| 105063 | 3384 |

**LEAVE INFORMATION**

| 30.BEG LV BAL | 31 LV EARN | 32 LV USED | 33 END LV BAL | 34 LV COST | 35 LV PD | 36.MONTHLY ACCRUAL |
|---|---|---|---|---|---|---|
| 185 | 15.0 | | 290 | 45 | | 905 |

**ACCRUAL / DEBT**

| 37 TOTAL ACCRUAL | 38.BALANCE DUE US |
|---|---|
| 905 | 26800 |

**REMARKS**

```
       MID-MONTH CHECK NUMBER    60450556
  ITM6B CANCELED*CK 59738208 7902
  ITM6C CANCELED*CK 60077097 7902
  ITM8C  COLLECTION OF BASIC PAY     FEB 79
  ITM8D  COLLECTION OF JUMP PAY      FEB 79
  ITM8E  COLLECTION OF BAQ-O/RGHT    FEB 79
  ITM8F  COLLECTION OF CLOTHNGALW    FEB 79
  ITM8G  COLLECTION OF SEP RATS      FEB 79
  01 FEB 79 ABS CIVIL
  09 FEB 79 DUTY HOSP       1330 HOURS
  13 FEB 79 ABS CIVIL  ←
  01 MAR 79 ABS CIVIL  CONTINUED FROM PRIOR MONTH
  17 MAR 79COMP 04 YRS SVC  BASIC PAY              CORR
  ITM14  DSSN 5071   DOV/PR   EF2    DATE 15 MAR 79
  ADMCH  MO ACCRUE   CHANGED TO   999999
  ****  CONTINUED ON NEXT PAGE  ****
```

**FINANCE OFFICE INFORMATION**

| 40 DSSN | 41 EOM CK NO | 42 SSDC | 43 OPED | 44 PEAD | 45 BASD. ASED | 46 TI OS | 47 YRS | 48 ETS DATE | 49 PK. NO | 50 760B ADJ LV BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 5071 | | MRN | 770822 | 750510 | 771014 | | | 03811013 | EF2 | |

```
INS    01 METROPOLITAN LIFE INS                  7902 9999 7902
          1MADISON AVE            TYREE WILLIAM M JR        9
          NEW YORK      NY 10010          0161
FININO1   FORT DEVENS FED CR UN              7804 9999 7902
                               8966321-0 TYREE WILLIAM M    9
          FT DEVENS     MA 01433          0161
CFC    01 COMBINED FEDERAL CAMPAIGN          7801 7711 7812 0
          PO BOX 227                                        1
          PETERSBURG    VA 23803          6380
CFC    02 COMBINED FEDERAL CAMPAIGN          7901 7912 7902
          WORCESTER CTY NTL BK                              9
          FT DEVENS     MA 01433          0161
```

Sidebar (rotated text):
"13 FEB 79 ABS CIVIL" is February 13, 1979, I was absent from duty due to civilian apprehension, arrest, and confinement.

FOR OFFICIAL USE ONLY
This document contains items
EXEMPT FROM ...

6

Commonwealth v. Tyree.

The next afternoon, Wednesday, February 14, Tyree set up a meeting with Aarhus off the base and arranged to have police officers present. When Tyree and Aarhus failed to appear, the officers went to the CID building at Fort Devens. Within a few minutes Tyree appeared and announced, "I've just seen the knife, the knife is in the barracks under Aarhus' pillow and you'd better get down there before it's moved." After receiving permission from military authorities, police officers and Army Criminal Investigation Division agents went to the service company barracks and searched Aarhus' room. Under his pillow, they found a knife with a four-and-one-half inch blade in a sheath, wrapped in a plastic bag. The knife had "Captain Beyond" inscribed on the blade and was covered with bloodstains later determined to be of Elaine Tyree's blood type. Officers arrested Aarhus immediately and brought him back to the CID building within thirty-five or forty

Commonwealth v. Tyree.

minutes after Tyree had entered that building. Shortly thereafter, Tyree was arrested.

EXHIBIT

B

# DISPOSITION FORM

For use of this form, see AR 340-15; the proponent agency is TAGCEN.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
|---|---|
| SFSV | ADVERSE PERSONNEL INFORMATION |

| | FROM Commander | DATE 15 Feb 79 | CMT 1 |
|---|---|---|---|
| Commander, 10th SFGA<br>ATTN: SFSB<br>Fort Devens, MA 01433 | SVC CO, 10th SFGA<br>Fort Devens, MA 01433 | | |

SUBJECTS: AARHUS, Erik Yngvar; PV1; ▮▮▮▮▮▮▮
          TYREE, William Murry Jr.; PV1; 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
          ROSARIO, Ramos Rafael; SP4; ▮▮▮▮▮▮▮

REFERENCES: CID Report No. 79-CID062-08017-5H1B
            CID Report No. 79-CID062-08018-5L3B/5L3C

SYNOPSIS: Between 1030 - 1230, 30 Jan 79, in Ayer, MA, at the off post residence
of William and Elaine Tyree, E. Tyree was murdered by someone who stabbed her in
the chest several times and cut her throat. An investigation was undertaken by
the Ayer Police Department and the detectives from the Massachusetts State Police
with the assistance from the CID. At 1820, 13 Feb 79, W. Tyree informed CID and
the civil authorities that Aarhus admitted to him that he had murdered E. Tyree,
and he (W. Tyree) had seen the murder weapon in Aarhus' room in the barracks at
Ft. Devens. A search warrant was procured and executed by CID at which time a
blood-stained butcher knife suspected to be the murder weapon, and blood-stained
clothing was recovered from Aarhus' room, Room 141, Bldg P-641, Ft Devens, MA.
During questioning of Aarhus, he confessed to having murdered E. Tyree, after W.
Tyree offered to pay him $5,000.00 to kill her. Aarhus and W. Tyree were arrested
by civil authorities and confined pending judicial process. Incident to the above
search of Aarhus' belongings, a box containing an estimated 300 to 400 blue
tablets, suspected to be DIAZPAM, valued at approximately $300.00 was found.
Further questioning of Aarhus indicated that he had procured the tablets from
Rosario. Rosario was apprehended by the CID at 0700, 15 Feb 79, charged with
wrongful possession and sale of a controlled substance, and released to the unit.
Further information will be provided as it becomes available.

STEPHAN V. OTTESEN
CPT, IN
XO

NOTE: "Aarhus and W. Tyree were arrested by civil authorities..." The Army
failed to investigate this matter when it was brought to their attention in
June 2003. You would think that where the (civilian) court of jurisdiction,
the Massachusetts Supreme Judicial Court had found that the actual date of my
arrest was not until February 14, 1979, that the U.S. Army would have been
interested in getting to the bottom of this matter. Where the Army failed to
investigate and correct the matter, the cover up is clearly seen.

5

DA FORM 2496

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

| 1. NAME (Last, first, middle): | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. (Also, Service Number if applicable). | | |
|---|---|---|---|---|
| Tyree, William Murray Jr. | ARMY/RA | | | |
| 4. MAILING ADDRESS (Include ZIP Code) | | | | |
| 12913 S. 1800 W. Riverton, UT 84065 | | 528 | 96 | 6321 |

5. ORIGINAL DD FORM 214 IS CORRECTED AS INDICATED BELOW

| ITEM NO. | CORRECTED TO READ |
|---|---|
| | SEPARATION DATE ON DD FORM 214 BEING CORRECTED - 82 10 15 |
| 13. | Parachute Badge |
| | ————————————————LAST ENTRY———————————————— |

| 6. DATE | 7. TYPED NAME, GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN |
|---|---|
| 5 May 1999 | Kathryn G. Frost, Brigadier General, USA, Adjutant General |

**DD** FORM 215
1 JUL 79

PREVIOUS EDITIONS
OF THIS FORM ARE
OBSOLETE.

**CORRECTION TO DD FORM 214, CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY**

MEMBER 1

PRETRIAL PLEADINGS AND MOTIONS    **277 § 47A**

s open on a plea of
n. (1968) 235 N.E.2d

nity of defendant is
ridence is offered at
unity.  Chin Kee v.
87, 354 Mass. 156.

e photograph of de-
ified she had identi-
ings of photographs
three men she saw
d business establish-
inds lack of counsel
ings was violative of
de it impossible to
r photographic con-
ibly suggestive in vi-
endment.  Com. v.
678, 361 Mass. 889.

defendant upon his
d out to him and at
e was again advised
signed a waiver and
nor for use of tele-
ilid ground for com-
f his confession was
on which preceded it
.  Com. v. Betten-
20, 361 Mass. 515.

nt, without presence
e in light of all the
police bias was sug-
cedure under which,
ntified defendant in
i emphasized at trial
s his before he was
observe the men in-
dant.  Com. v. Jack-
79, 359 Mass. 759.

ould be inadmissible
after United States
equiring that an ac-
hts to remain silent
ited if he is indigent
been specifically ad-
unsel paid for by the
statement was taken
ment took place pri-
decision.  Com. v.
.2d 924, 358 Mass.

t in custody, nor be-
d and second defen-
made to police offi-
ers, admissions were
sfendant was without
(1968) 239 N.E.2d 5.

354 Mass. 598, certiorari denied 89 S.Ct. 697,
303 U.S. 1056, 21 L.Ed.2d 698.

Guilty plea which defendant has entered to
charge at probable cause hearing where he was
without counsel is inadmissible in his trial on
charge.  Arsenault v. Com. (1968) 233 N.E.2d
730, 353 Mass. 575.

Admission of defendant's plainly prejudicial
statement made to police officers more than six
months after he had been indicted and in ab-
sence of counsel known to one officer was er-
ror.  Com. v. McCarthy (1964) 200 N.E.2d 264,
348 Mass. 7.

A written confession obtained without threats,
promises or mistreatment before defendant had
been brought into any court was admissible in
prosecution for murder, though defendant had
not been advised, prior to procurement of con-
fession, of his right to assistance of counsel.
Com. v. McNeil (1952) 104 N.E.2d 153, 328
Mass. 436.

**24. Exceptions**

Since G.S.1860, c. 112, § 9, there is a right of
exception to rulings on questions of law in capi-
tal cases.  Com. v. Dower (1862) 86 Mass. 297,
4 Allen 297.

**25. Review**

Where defendants' counsel requested court to
apprise jury of fact that codefendant had plead-
ed guilty in their absence, court's statement that
with consent of all parties in interest he desired
to announce that such codefendant had pleaded
guilty was not erroneous, since jury must have
understood that judge's announcement was
with other defendants' consent and not that plea
of guilty was with their consent.  Rettich v. U.S.
(C.C.A.1936) 84 F.2d 118.

An order denying accused permission to with-
draw a plea of not guilty and plead anew will
not be reviewed, in the absence of abuse of the
discretion of the trial court.  Com. v. Tucker
(1905) 76 N.E. 127, 189 Mass. 457.

PLEADINGS AND MOTIONS BEFORE TRIAL

*Caption added by St.1965, c. 617, § 1.*

## § 47A.    Defenses or objections

In a criminal case, any defense or objection based upon defects in the
institution of the prosecution or in the complaint or indictment, other than a
failure to show jurisdiction in the court or to charge an offense, shall only be
raised prior to trial and only by a motion in conformity with the requirements
of the Massachusetts Rules of Criminal Procedure.  The failure to raise any
such defense or objection by motion prior to trial shall constitute a waiver
thereof, but a judge or special magistrate may, for cause shown, grant relief
from such waiver.  A defense or objection based upon a failure to show
jurisdiction in the court or the failure to charge an offense may be raised by
motion to dismiss prior to trial, but shall be noticed by the court at any time.
Added by St.1965, c. 617, § 1.  Amended by St.1965, c. 756, § 1; St.1978, c. 478, § 298;
St.1979, c. 344, § 39.

### Historical and Statutory Notes

St.1965, c. 617, was approved Aug. 9, 1965,
and by § 3 made effective Oct. 4, 1965.

St.1965, c. 756, § 1, approved Nov. 16, 1965,
and by § 3 made effective as of Oct. 4, 1965, in
the fourth paragraph, added the second sen-
tence.

St.1978, c. 478, § 298, approved July 18,
1978, and by § 343 made effective January 1,
1979, in the fourth paragraph, in the second
sentence, substituted "a jury session", and "said
jury session", respectively, for "the district
court".

St.1979, c. 344, § 39, an emergency act, ap-
proved June 30, 1979, and by § 51 made effec-
tive July 1, 1979, rewrote the section which
prior thereto read:

"The pleadings in criminal proceedings shall
be the indictment or complaint, and the pleas of
not guilty, guilty and nolo contendere.  All oth-
er pleas, and demurrers, challenges to the array
and to the manner of selection of grand or
traverse jurors, and motions to quash are here-
by abolished, and any defenses and objections,
which could have been raised before trial by

409

EXHIBIT

C

# Saturday

For details of premium-channel movies, see the guide following listings.

**8PM**
**9PM**

Renoj, who befriends and teams up with an orphaned 12-year-old. Gary Oldman.
**Storytellers**—Music 225023 

8:30 **Chef!**—Comedy 3333
Gareth becomes furious when Everton (Roger Griffiths) gains notoriety with his own dish.
**Cops** (CC) 908889071
A visit to Las Vegas features a look at a casino's security system, which shows how customers attempt to cheat. (Repeat)
**Business Unusual** (CC) 533464
**Paula Poundstone** 1:00 835941
The comedienne discusses parenting, aging.
**Baseball** 3:00 1522930
Anaheim at Texas. (Live)

**Decorating Cents** 799787 
**Real World Casting** 1:00 886690
The network's seventh season cast is selected.
**All That**—Comedy 473873
**Dial M for Murder** (CC) 702110
—Thriller 1:50 90195934
(1954) Alfred Hitchcock directed this version of the Frederick Knott play, in a tennis pro who plots to kill his wife. Ray Milland, Grace Kelly.
**Grand Ole Opry Live** (CC) 702110
**Number Ones**—Music 81605517058

8:40 **D3: The Mighty Ducks** (CC)—Comedy 146520109649 Emilio Estevez.

**9 PM**
Ambrose (Peter Hanly) has a hard time dealing with his child's impending birth, while Niamh has a worse time dealing with her mother-in-law. Niamh; Tina Kellegher.
**Early Edition** (CC) 1:00 
Snug and Marissa decide to do the wedding of Gary's former sweetheart (Carl Sheynei), a woman who, according to Gary's paper, will be murdered on her wedding day. Starr, Brian McNamara. Father Mark: Tim Grimm. (Repeat) 104442
**DamonSport** 1:00 844482
Bob Powers performs a Latin-style dance, and Luca Baricchi and Loraine Barry offer a ballroom demonstration. Cyd Charisse is the host.
**America's Most Wanted** (CC) 1:00
A California murder case. 751107014839
**Kenny Wayne Precision** (CC) 1:00
Asbrodie casts an odd spell on Gabrielle: everything she writes comes to pass. Of course, what Gabrielle writes isn't always precisely what she means. Minya: Alison Wall. 322232
**Investigative Reports** 1:00 966600
**Julia**—Drama 2:05 31519308
(1977) Oscar-winning adaptation of Lillian Hellman's memoir about a perilous mission in Nazi Germany. Jane Fonda, Vanessa Redgrave. Paul Hill: John Lynch. (3:00)
**Hit List** 1:00 881226
**Rivera Live**—Discussion 1:00 6285145
**Larry King Weekend** (CC) 1:00 113481

**EDITORS' CHOICE**

**IN THE NAME OF THE FATHER** (CC)
SAT. 8 PM

Daniel Day-Lewis (pictured) and Pete Postlethwaite shine in a stirring 1993 political drama. This classic "wrong man" scenario is based on the actual events surrounding the wrongful imprisonment of Gerry Conlon (Day-Lewis), whose only crime "was that he was bloody well Irish, and... foolish and in the wrong place at the wrong time." With his equally innocent father (Postlethwaite), a handful of relatives and their friends, Gerry is convicted of a 1974 IRA bombing in England. He spends 15 years in British prisons until a crusading lawyer (Emma Thompson) takes up his case. Dixon: Corin Redgrave. Paul Hill: John Lynch. (3:00)

**Ultimate Guide** 1:00 671435 
A study of sharks, including their anatomy, diet, evolution and behavior.
**Gotham**—Mystery 2:00 511435
(1988) A gumshoe (Tommy Lee Jones) is hired by a man who claims to be harassed by his wife—who's been dead for 10 years.
**This Evening with Judith Regan** 1:00
**Room by Room** 904455
**Weekend Magazine with Stone Philips** 1:00 478706
A baby at the city blame Ron Harper is injured by a runaway Ferris wheel. Kenan Kenan Thompson; the mishap. Kel Mitchell, Kenan Thompson.
**The Outsider** (CC)—Science Fiction 2:00 900106
(1997) In a futuristic amusement park called "Similar World," where dreams can turn into android bad guys—until the master computer creates an "outsider" with the ability to kill all one. Dr. Greenameet: David Leisure.
**World's Greatest Escape Artists** 
**Harlequin's Diamond Girl** 
**Sex Appeal**—Music Videos 675145 

**Statler Brothers** (CC) 1:00 809697
—Drama 1:35 88539 

---

Remembering Phil Hartman

Jensen Ackles (top), Laura Wright and Ingo Rudmacher

# TV GUIDE

June 13-19
$1.19

**Daytime's 12 Hottest Stars!**

# SUMMER SOAPS PREVIEW

A sneak peek at what's in store on *Days of Our Lives, Guiding Light, General Hospital* and all your other favorites.

By Michael Logan

EXHIBIT D

TV GUIDE 75

G. D. CLIKEY GARN
UTAH

07 DIRKSEN SENATE OFFICE BUILDING
TELEPHONE: 202-224-5444

JEFF M. BINGHAM
ADMINISTRATIVE ASSISTANT

## United States Senate

WASHINGTON, D.C. 20510

COMMITTEES:
APPROPRIATIONS
BANKING, HOUSING AND
URBAN AFFAIRS
INTELLIGENCE

March 29, 1983

```
┌─────────────────┐
│    EXHIBIT      │
│                 │
│       E         │
└─────────────────┘
```

Mr. William Murry Tyree
Box 100
South Walpole, Massachusetts 02071

Dear Mr. Tyree:

I apologize for the delay in responding to your previous request for a notorized statement from me regarding the events surrounding my inquiries to the Department of the Army.

Since initial contact with my office was in 1978 concerning court-martial proceedings against you by the Army, all of our files were in microfilm form.

Accordingly, I will attempt to respond to your questions for the record.

1.  The first time I learned that there were possible threats against you and your wife was in December of 1978 upon receipt of the December 17, 1978 letter from your parents. They expressed concern that you would not turn in evidence against some of your alleged friends who were also implicated in the theft of government property. Specifically they stated, "There is a positive danger here. A danger to my son, daughter-in-law, and three-week old granddaughter... At this point I am not sure that he has not been threatened. He would not admit it if he had been."

2.  After receipt of your parents' December 17, 1978 letter, I again wrote to the Department of the Army, Major G. James Lee, Chief of Legislative Liaison, on January 12, 1979 and enclosed a copy of the December 17 letter. I do not have a copy of my letter. I only have a notation that we contacted him on January 12, 1979. My letter would have requested the Army to look into this matter and to report back to me.

    Prior to receipt of your parents' letter of December 17, 1978, I received a report from the Department of the Army, Col. Forest S. Rittgers, Jr., dated November 24, 1978. This was in response to my inquiry to the Army dated October 25, 1978, after receipt of your letter to me which I received on October 17, 1978.

Mr. William Murry Tyree
March 29, 1983
Page 2

Neither of these pieces of correspondence indicated any threat to life or danger, or the involvement of drugs or arms trafficking. Col. Rittgers only indicated a charge of stealing and selling of government property. Your letter discusses the events that led to your being implicated in theft, your clean record and promotion and how you were being wrongfully accussed for something you did not do.

3. As I indicated previously, I made written inquiries to the Army on October 25, 1978 and on January 12, 1979 in response to your letter and your parents' letter to me respectively. The Army had not responded in writing to my January 12, 1979 inquiry which mentioned the threat to your life and that of your late wife. However, our office did, on January 29, 1979, receive a call from someone named Doucette from the Army. The message left was that they (the Army) received our latest inquiry and it would be two weeks before we would get an answer. The next contact was from your mother by telephone regarding the tragic death of your wife.

4. I do not know for certain whether Col. Forest Rittgers knew of the threat to life prior to January 30, 1979, but there was sufficient time for him to be notified.

5. I also have on record statements by your father that he called Col. Rittgers on January 18 and January 19, 1979 and told him of threatening phone calls you and your wife had been receiving and requested that you be transferred to safety. According to our notes of the first conversation, Col. Rittgers had said that he hadn't read through the report and promised to check with the provost marshall to post a patrolman around your house.

6. As I stated previously, I received a report from Col. Rittgers on November 24, 1978 regarding your court-martial proceedings. Again on May 26, 1979, I received a report from Col. Robert L. Simpson, Chief, Assistance Division, Office of the Inspector General. It stated that final action on your appeal of the military justice proceedings has not been completed, but if you had any questions, you should check with Fort Devens Staff Judge Advocate General.

Mr. William Murry Tyree
March 29, 1983
Page 3

7.  I have no knowledge that Fort Devens has ever been investigated
    with respect to drug trafficking.

8.  I have not been asked to investigate Fort Devens for other
    illegal activities.  It was your parents and you who mentioned
    books and diaries your late wife, Elaine, had kept on illegal
    activities going on at Fort Devens.

    Sometime between January 31 and February 2, 1979 my staff
    assistant was notified by a man (possibly Col. Moore or
    Maj. Garrett) from Army Liaison that this case possibly
    involved arms and drug trafficking at Fort Devens.  That
    was the first time my office heard of this issue being
    introduced.  On May 22, 1979 you wrote to me and also
    mentioned drug involvement.

I hope this information adequately addresses your questions.

                                        Sincerely,

                                        Jake Garn

JG/jde
Enclosure

_____  4/8/83

          NOTARY PUBLIC
        DISTRICT OF COLUMBIA

MY COMMISSION EXPIRES APRIL 30, 1987

# General Discharge



## Under Honorable Conditions
### from the Armed Forces of the United States of America

*This is to certify that*

WILLIAM MURRAY TYREE JR, PRIVATE  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  REGULAR ARMY

*was Discharged from the*

# United States Army

*on the* 15TH *day of* OCTOBER 82 *under honorable conditions*

A. J. TETTERTON
CW2 USA
CHIEF SVC DIV

DD FORM 257A



# DEPARTMENT OF THE ARMY
## HEADQUARTERS FORT DEVENS
### FORT DEVENS, MASSACHUSETTS 01433

REPLY TO
ATTENTION OF:

AFZD-CO

7 JUL 1980

SUBJECT:  Conviction by Civil Court:  PV1 William M. Tyree, 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

THRU:   Commander
        US Army Forces Command
        ATTN:  AFPR-MP
        Fort McPherson, GA 30330


TO:     Commander
        US Army Military Personnel Center
        ATTN:  DAPC-EPA-A-S
        Alexandria, VA 22331


1.  PV1 Tyree was convicted 29 February 1980 of first degree murder by
the Massachusetts Superior Court and sentenced to life imprisonment.
The crime was the murder-for-hire of his wife, herself a member of the
US Army.  The details are set forth in the attached record of elimin-
ation board proceedings.  This exceptionally brutal murder and the
ensuing trials of PV1 Tyree and his accomplice were the subject of
constant notoriety throughout Fort Devens and the State of Massachusetts
of over one year.  (Incl 1)

2.  Despite the provisions of paragraph 14-15a, AR 635-200, the board
of officers convened UP Section III, Chapter 14, AR 635-200, recommended
PV1 Tyree be discharged for his murder conviction with a general dis-
charge.  I consider this incredible recommendation to be a travesty and
an embarrassment to the Army totally unsupported by the record, but under
the provisions of paragraph 14-17b(3), AR 635-200, I have no authority to
set aside or overrule the recommendation of the board as to character
of discharge.  HQDA has the authority UP paragraph 1-2a, AR 635-200, to
take corrective action in this case to direct the discharge of PV1 Tyree
with an appropriate discharge under other than honorable conditions.

3.  Under the circumstances, in view of the overwhelming evidence of
guilt and the adverse impact the unfavorable publicity in this case
has already had upon the 10th Special Forces Group (Abn), Headquarters
Fort Devens, and the United States Army, request immediate discharge

Incl 4

AFZD-CO
SUBJECT:   Conviction by Civil Court:  PV1 William M. Tyree, 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

under other than honorable conditions of PV1 Tyree despite his notice
of appeal (paragraph 14-13, AR 635-200).

RICHARD J. KATTAR
Colonel, Infantry
Commanding

Incl
as

2

DAPC-EPA-A-S (7 Jul 80)  1st Ind
SUBJECT:  Conviction by Civil Court:  PV1 William M. Tyree, 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

DA, MILPERCEN, 2461 Eisenhower Avenue, Alexandria, VA  22331       2 4 SEP 1980

TO  Commander, Fort Devens, ATTN: AFZD-CO, Fort Devens, MA  01433

1.  Your request for discharge of Private Tyree has been carefully reviewed.

2.  It has been determined by the Office of The Judge Advocate General that
circumstances that compel immediate discharge normally will not arise where
the member will remain in civil confinement pending action of the appeal.
Further, it would be legally objectionable for HQDA to direct a discharge
characterization less favorable than that recommended by an administrative
separation board, notwithstanding the provision of paragraph 1-2a, AR 635-200.
Therefore, your request to discharge Private Tyree is disapproved.

3.  Recommend that Private Tyree be reassigned to the nearest Personnel
Confinement Facility in accordance with AR 600-62 pending the outcome of his
appeal.

FOR THE COMMANDER:

1 Incl                              CHARLES E. MAGAW
nc                                  Major, GS
                                    Chief, Appeals Branch

2



I, William M. Tyree, on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, 6/1-04.

William M. Tyree, P.O. Box 100,
S. Walpole, Massachusetts, 02071



## U.S. Postal Service
### CERTIFIED MAIL RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

WASHINGTON, DC 20310-0101

| | |
|---|---|
| Postage | $ 1.29 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.34 |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
JAG, The Pentagon, 101 Army Pentagon
Street, Apt. No.; or PO Box No.
The Pentagon
City, State, ZIP+4
Washington, D.C. 20310-0101

PS Form 3800, February 2000    See Reverse for Instructions

7099 3400 0018 8741 0135

**UNITED STATES POSTAL SERVICE**

— Intranet Item Inquiry - Domestic

| Date/Time Mailed: 06/18/2003 15:28 | |
|---|---|
| City: WASHINGTON | State: DC |
| City: MANCHESTER | State: MA |

| Special Services | Associated Labels | Amount |
|---|---|---|
| CERTIFIED MAIL | 7099 3400 0018 8741 0135 | $2.30 |
| RETURN RECEIPT | | $1.75 |

| Event | Date | Time | Location |
|---|---|---|---|
| DELIVERED | 06/23/2003 | 06:32 | WASHINGTON DC 20301 |

Firm Name: PENT MISC 20310 R11

Recipient : 'L JOHNSON'

Request Delivery Record

(A PS Form 3849, Delivery Receipt, has not been appended to this record. If the item was recently delivered, the Delivery Receipt may not yet have been scanned.)

| Event | Date | Time | Location |
|---|---|---|---|
| ARRIVAL AT UNIT | 06/23/2003 | 02:48 | WASHINGTON DC 20599 |
| ACCEPT OR PICKUP | 06/18/2003 | 15:28 | MANCHESTER MA 01944 |



Enter Request Type and Item Number:

Quick Search ⦿    Extensive Search ○

Explanation of Quick and Extensive Searches

Item Number:

Submit

Inquire on multiple items.

Go to the Product Tracking System Home Page.

```
┌─────────────────────┐
│     EXHIBIT         │
│                     │
│        3            │
│  _____    │
└─────────────────────┘
```

I, William M. Tyree, on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, _6-11-04_.

_William M. Tyree_ / P.O. Box 100,
S. Walpole, Massachusetts, 02071

June 30, 2003


United States Army
Attn: The Inspector General
        SAIG-AC
1700 Army Pentagon
Washington, D.C. 20310-1700



RE: Request For Assistance And
    Investigation Into Violations
    Of The Uniform Code Of Military Justice.



Dear sir,

       Please find attached a copy of a letter, with exhibits that
has been served on the Staff Judge Advocate, and several members
of the United States Congress.

The crux of the complaint is this:

       1. U.S. Army, Fort Devens, MA., did on <u>13 Feb 1979</u> release me
to civilian authorities for arrest in the murder of my wife, who
was also a soldier;
       2. this release must be UP **UCMJ** Article 7, Article 9: no
release without probable cause is possible;
       3. throughout my 1979 Probable Cause Hearing, (12½ days long
with 45-50 witness'es), and my 1980 trial, (10 days long with 18-
20 witness'es), the U.S. Army (through two very questionable CID
agents), were very elusive about the exact time and date of my
arrest. This resulted in the events of 13 Feb 1979 being in such
a state of question that the Massachusetts Supreme Judicial Court,
(SJC), took the only action available to it;
       4. the SJC rendered a written published opinion, (relevant
page attached), that reflects no probable cause existed for my
arrest until <u>14 Feb 1979</u>.

Now we have a problem as described within the letter to the SJA,
and the members of Congress. In an effort to hide their illegal
conduct on the evening of 13 Feb 1979, the CID agents did bring
the SJC to the realization that the actual probable cause for my

Page two
Letter To SAIG-AC

arrest didn't exist until 14 Feb 1979. Without being redundant, and reciting the contents of the letter to the SJA attached, I direct your attention to that letter and request the SAIG-AC take the following immediate action: n.1/

**RELIEF REQUESTED:**

5. refer this matter to the SJA with a recommendation for a Court Of Inquiry. (Keep in mind that once the Army surrendered me to the civilian authorities, the civilian judicial finding is binding on the Army unless the Army judicially investigates, and then makes a Motion in the civilian court of record to change the SJC published opinion. As long as the SJC published opinion stands on the date of my arrest being 14 Feb 1979, we have a prima facia violation of the UCMJ at Article 7 and 9. A matter that Congress can investigate and correct if the Army decides to continue to hide from the ugly facts in this case);

6. recommend to the SJA that once a conclusive time and date for my arrest has been established, that the SJA through judicial Motion into Middlesex Superior Court, Middlesex County, State of Massachusetts, file to correct the date and time of the arrest;

7. recommend that the DD Form 4187 1 May 74 (Edition), be located in my 201 Personnel File that was tendered by my Commanding Officer, which should indicate the date and time that my duty status in 10th Special Forces Group, Airborne, (SFG(A), was changed from present for duty, to "confined by civil authorities." DD Form 4187 was mandatory in 1979, and had to verified within 72 hours of the change in duty status;

8. recommend that the DD Form 4187 once located, be filed with the civilian authorities as the basis for the correction of the date of probable cause and arrest;

9. recommend that SJA physically travel to Walpole State Prison upon location of DD Form 4187 (that will verify date and time of arrest), and interview me to determine if additional issue's exist that could impact and conflict with the date and time found in the DD Form 4187;

10. recommend that SJA respond to individual issue's raised in the attached letter since the SJA is in a better position to legally address this matter than the SAIG-AC is.

Page three
Letter To SAIG-AC


I respectfully thank you in this matter and look forward to your response.

                              Sincerely,

                              *William M. Tyree*
                              Willaim M. Tyree
                              P.O. Box-100
                              S. Walpole, MA. 02071


cc: Members of Congress previously contacted
    Members of the media previously contacted
    Attorney Raymond D. Kohlman, (Judicial Ph.d)
    file

---

**n.1/** The SAIG-AC has a mandate to investigate and correct alleged violations of the UCMJ. This packet is a prima facia showing that no probable cause existed for my arrest on 13 Feb 1979 according to the state court. Since the state court has the jurisdiction over my person (absent the Army reasserting control over me), the Army is bound by the state court decision. That decision is the authority by which the Army discharged me. If the Army found the SJC decision to be sufficeint and valid enough to warrant my discharge, then the Army has already accepted the decision and date of my arrest as 14 Feb 1979. If that is the case, WHY DID THE ARMY RELEASE ME TO CIVILIAN AUTHORITIES ON 13 FEB 1979? I look forward to your response in this matter and recommend that this mess be given to the SJA to sort out.



I, William M. Tyree, on oath state that the

copies attached as pages to this exhibit are

true genuine copies of the documents they

purport to represent. Signed under the pains

and penalties of perjury on this date, _6-11-04_.

_William M. Tyree_

William M. Tyree, P.O. Box 100,
S. Walpole, Massachusetts, 02071



**DEPARTMENT OF THE ARMY**
OFFICE OF THE INSPECTOR GENERAL
1700 ARMY PENTAGON
WASHINGTON DC 20310-1700

July 25, 2003

Assistance Division

Mr. William Tyree
P.O. Box –100
South Walpole, MA  02071-0100

Dear Mr. Tyree:

   We are replying to your June 30, 2003 letter to the Department of the Army, Inspector General concerning your request to have the matters you present submitted to the Army Staff Judge Advocate, for a recommendation that a court of inquiry be convened.

   By policy, the inspector general system does not normally address matters where a more appropriate avenue of redress is available to resolve a dispute.  The appropriate avenue of redress for the matters you presented is The Judge Advocate General.  Since you have already submitted a request directly to that agency, further action by the inspector general is not warranted.

   If you wish to contact the Department of the Army, Inspector General regarding this case in the future, please reference the case number, DIH 03-0611.  We trust this reply has been informative.

                              Sincerely,

                              James E. Clark Jr

                              James E. Clark, Jr.
                              Lieutenant Colonel, U.S. Army
                              Inspector General

Printed on Recycled Paper

```
EXHIBIT

   5
```

I, William M. Tyree, on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, _6-1-04._

_William M. Tyree_
William M. Tyree, P.O. Box 100,
S. Walpole, Massachusetts, 02071

January 18, 2004


Department Of The Army
**Attn: Secretary Of The Army**
104 Army Pentagon
Washington, D.C.   20310-0104


RE: **Refusal Of the Inspector**
    **General To Investigate The**
    **Staff Judge Advocate For A**
    **Cover-Up & Violation Of The**
    **UCMJ In A Civilian Homicide-**


Dear Mr. Secretary,

     Please review the following exhibits which will outline the
cover up and violation of the Uniform Code Of Military Justice,
(UCMJ):

     1. Letter to JAG dated June 9, 2003;
     2. Proof of service on the JAG on June 18, 2003: JAG received
        the letter of June 9, 2003, on June 23, 2003;
     3. Letter to the I.G., dated June 30, 2003, requesting the
        I.G. to investigate the JAG, and the contents of the June
        9, 2003, letter to the JAG;
     4. Letter from the I.G. dated July 25, 2003, which outlines
        that the I.G. will not intervene in the matter because
        the I.G. is under the mistaken belief that the JAG will
        do it's job: the JAG is deliberately avoiding this case
        because of the events described within the letter of June
        9, 2003.

At this point I request the following from the Office Of The
Secretary Of The Army:

     5. Please convene a Court Of Inquiry to investigate this
matter;
     6. Please provide me with the address of the Army JAG Office
to whom I would submit a "CLAIM FOR DAMAGE, INJURY, OR DEATH,"
Standard Form 95 (Rev. 7-85). If the Army cannot, or will not

Page two

police itself, my next step is to file suit for the negligence and violations of the UCMJ. That would include the violation of my Civil Rights.

I look forward to your response in this matter. PLEASE TAKE NOTICE, THAT I AM ATTEMPTING TO HANDLE THIS MATTER IN HOUSE. I'M AN ARMY BRAT AND MY FAMILY IS RETIRED U.S. ARMY. Thank you for your time irregardless of what action you undertake.

Respectfully submitted,

William M. Tyree
P.O. Box-100
S. Walpole, MA. 02071

cc: JAG, 1700 Army Pentagon, File # DIH 03-0611.
    President George W. Bush
    file



**EXHIBIT**

**6**

I, William M. Tyree, on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, 6-11-04.

William M. Tyree / P.O. Box 100,
S. Walpole, Massachusetts, 02071

This is the civilian police department that sought and attained the arrest of William M. Tyree at 1820 Hours on 2/13/79; the cops were crooked.

# Chronology of a police nightmare

### By PATRICIA MONTMINY
### Sun Staff

AYER. — The bizarre story which has ripped apart a police department began Feb. 25, 1980 when employees opened the doors of the Ties Construction Co. to find that the business had been pillaged by intruders.

Equipment, furniture, and windows had been smashed. Fires had been started and a fork lift was driven into the walls. The damage estimate was $25,000.

For a year the incident lay dormant, but festered. Then the situation exploded with a series of events that tore the police department wide open and sent shock waves into the community which are still being felt.

The following chronology begins after late February, 1980 when Officer Stanley Randall was sent to investigate the break and vandalism.

— February 29, 1980 — Officials at Ties Construction rehire a private paid police detail. The detail had been discontinued six weeks earlier, because of a business slump. Policemen had described the Ties detail as the one of "most lucrative ever."

— June 8, 1980 — The Ties detail ends when the business closes its operations in the area.

— Months later — Officer Edward Gintner, according to Officer Randall, weaves a strange story about the role Gintner played in driving three other policemen to the Ties site.

— April 28, 1981 — Officer Gintner talks to Officer Leon Smith about his involvement in Ties. The story spreads through the department.

— May 20, 1981 — Officer Randall confronts Officer Gintner, and they talk about the Ties incident. Randall later says publicly that the damage was done to retaliate against the company for the discontinuance of the police detail.

— Mid-summer, 1981 — Someone calls the state's attorney general's office.

— July 18, 1981 — Ayer Officer William Adamson Jr., one of the officers implicated in the incident and son of Police Chief William Adamson Sr., resigns from the department to accept a position with the Boston and Maine Railroad Police.

— July /28, 1981 — Investigators from the AG's office arrive in Ayer and launch their probe, talking to Officers Randall and Smith.

— July 31, 1981 — AG investigators interrogate Gintner.

— Aug. 3, 1981 — An entry in the Ayer police log made by Chief Adamson indicates that he is aware of the investigation and has spoken to Gintner, Adamson Jr., Sgt. James Lenney and Officer Domenic Pugh. All the officers deny to Adamson any knowledge or involvement in the Ties break.

— Aug. 26, 1981 — Reports of the alleged involvement of four police officers in the Ties burglary breaks in the media.

— Aug. 27, 1981 — Officers Randall and Smith pass lie detector tests for the AG.

— Oct. 1, 1981 — Randall testifies at the trial of former Police Officer Ernest Downing, fired from the force after being charged with moral offenses. Downing is acquitted.

— Oct. 8, 1981 — Randall is charged with seven departmental rules violations, including violations stemming from his testimony at the Downing trial.

— Oct. 15, 1981 — Randall faces a hearing before the board of selectmen and to a continuous roar of 500 policemen, selectmen drops all charges.

In a hearing held earlier that evening, behind closed doors, Officer Pugh is given a three-day suspension for statements about the department which he made at the Downing trial.

— Oct. 19, 1981 — Breaking a long silence, Lenney, Gintner and Pugh hold a press conference and emphatically deny the Ties allegations. Gintner explains that his statements were made "jokingly."

— Oct. 23, 1981 — Chief Adamson goes to the Acton police station and informs Chief Chauncey Fenton that a rape took place Aug. 31, 1981, in Acton.

— Oct. 26, 1981 — The alleged rape victim is accompanied to the Acton police station by Ayer Officer Nancy Taylor. She files rape complaints, claiming Randall sexually assaulted her in the parking lot of the Rusty Scupper Restaurant.

— Oct. 27, 1981 — Randall is arraigned in Concord District Court for rape.

— Nov. 2, 1981 — Randall and Smith are the first witnesses to testify before a Middlesex County Grand Jury empaneled to hear evidence in the Ties case.

— Nov. 2, 1981 — With departmental troubles piling up and a grand jury actively probing the Ties affair, an embattled Police Chief Adamson resigns from his post.

— Nov. 8, 1981 — The alleged rape victim withdraws the complaints, and charges against Randall are dismissed.

— November, 1981 — A search for a new police chief begins and by Christmas selectman name ex-chief Adamson for $4 million, and also $1 million in damages from Lenney, Gintner, Adamson Jr., Taylor, the alleged rape victim, her friend John McIntosh, Denise Lee, the town of Ayer, and Selectmen Francis Colihan, Thomas Casey and Murray Clark.

— Jan. 30, 1982 — Rowley Police Chief Phillip Connors is hired as the town's chief lawman.

— April 1, 1982 — Officer Pugh, Sgt. James Lenney, and former officer William Adamson Jr. are suspended to appear before the grand jury hearing evidence in the Ties case. They do not testify; it is later revealed, because of what they say was a deal struck last fall between their attorney and the AG's office promising them that they would not be required to testify.

— April 12, 1982 — With the approval of his AG, Connors launches his own probe of the Ties incident. He orders Gintner to take a lie detector test.

— April 14, 1982 — Gintner is suspended from duty. He fails to take the polygraph after the chief refuses to give him an extension so that he can seek legal advice.

— April 20, 1982 — Sgt. Lenney is suspended for failing to take a lie detector test.

— April 21, 1982 — Pugh is suspended for the same offense. Both Pugh and Lenney say they would take the test if the lie detector company drops its position of requiring those tests; to first sign a waiver excusing them from the liabilities. All three officers file grievances with the state labor relations commission.

— April 23, 1982 — Lenney and Pugh are fired from the force for failing to obey an order from the chief of police in taking a lie detector test, and failing to testify before a grand jury.

— April 23, 1982 — Connors reveals both publicly that Randall and Smith last fall "unequivocally" passed a lie detector test and "unequivocally" passed a lie detector test.

— May 4, 1982 — Gintner is fired from the force for failing to obey an order from the chief by not taking the lie detector test.

— May 6, 1982 — Randall files a $16 million-dollar lawsuit against 12 people. Randall, finding allegations to Ties and his rape frame-up, sues ex-chief Adamson for $4 million, and also $1 million in damages from Lenney, Gintner, Adamson Jr., Taylor, the alleged rape victim, her friend John McIntosh, Denise Lee, the town of Ayer, and Selectmen Francis Colihan, Thomas Casey and Murray Clark.

— June 23, 1982 — Chief Connors reveals that he has obtained an "important piece of evidence which supports the contention that Randall was the victim of a rape frame-up."

— July 8, 1982 — The AG excuses a Middlesex County Grand Jury hearing evidence in the Ties case. No vote was taken, and the case left open.

— July 13, 1982 — News breaks that the only piece of physical evidence, a buck knife found at the scene of the Ties break was missing from the Ayer Police station.

— July 14, 1982 — Pugh tells The Sun that the buck knife is in the custody of another police agency. Chief Connors claims it is still missing.

— July 19, 1982 — Ex-Chief Adamson files $225,000 law-suit against Randall for slander

These are the police referred to in the enclosed Civil Action at ¶138.

By PATRICIA MONTMINY
Sun Staff

AYER – The bizarre story which has ripped apart a police department began Feb. 25, 1980 when employees opened the doors of the Ties Construction Co. to find that the business had been pillaged by intruders.

Equipment, furniture, and windows had been smashed. Fires had been started and a fork lift was driven into the walls. The damage estimate was $25,000.

For a year tho incident lay dormant, but festered. Then the situation exploded with a series of events that tore the police department wide open and sent shock waves into the community which are still being felt.

The following chronology begins after late February, 1980 when Officer Stanley Randall was sent to investigate the break and vandalism.

– February 29, 1980 – Officials at Ties Construction rehire a private paid police detail. The detail had been discontinued six weeks earlier, because of a business slump. Policemen had described the Ties detail as the one of "most lucrative ever."

– June 8, 1980 – The Ties detail ends when the business closes its operations in Ayer.

– Months later – Officer Edward Gintner, according to Officer Randall, weaves a strange story about the role Gintner played in driving three other policemen to the Ties site.

– April 28, 1981 – Officer Gintner talks to Officer Leon Smith about his involvement in Ties. The story spreads through the department.

– May 20, 1981 – Officer Randall confronts Officer Ginter, and they talk about the Ties incident. Randall later says publicly that the damage was done to retaliate against the company for the discontinuance of the police detail.

– Mid-summer, 1981 – Someone calls the state's attorney general's office.

– July 18, 1981 – Ayer Officer William Adamson Jr., one of the officers implicated in the incident and son of Police Chief William Adamson Sr., resigns from the department to accept a position with the Boston and Maine Railroad Police.

– July 28, 1981 – Investigators from the AG's office arrive in Ayer and launch their probe, talking to Officers Randall and Smith.

– July 31, 1981 – AG investigators interrogate Gintner.

– Aug. 3, 1981 – An entry in the Ayer police log made by Chief Adamson indicates that he is aware of the investigation and has spoken to Gintner, Adamson Jr., Sgt. James Lenney and Officer Domenic Pugh. All the officers deny to Adamson any knowledge or involvement in the Ties break.

– Aug. 26, 1981 – Reports of the alleged involvement of four police officers in the Tie burglary breaks in the media.

– Aug. 27, 1981 – Officers Randall and Smith pass lie detector tests for the AG.

– Oct. 1, 1981 – Randall testifies at the trial of former Police Officer Ernest Downing, fired from the force after being charged with moral offenses. Downing is acquitted.

– Oct. 8, 1981 – Randall is charged with seven departmental rules violations, including violations stemming from his testimony at the Downing trial.

– Oct. 13, 1981 – Randall faces a hearing before the board of selectmen and to a continuous roar of 500 onlookers, selectmen drops all charges.

In a hearing held earlier that evening, behind closed doors, Officer Pugh is given a three day suspension for statements about the department which he made at the Downing trial.

– Oct. 19, 1981 – Breaking a long silence, Lenney, Gintner and Pugh hold a press conference and emphatically deny the Ties allegations. Gintner explains that his statements were made "jokingly."

– Oct. 23, 1981 – Chief Adamson goes to the

Actor police station and informs Chief Chauncey Fenton that a rape took place Aug. 31, 1981, in Acton.

— Oct. 26, 1981 — The alleged rape victim is accompanied to the Acton police station by Ayer Officer Nancy Taylor. She files rape complaints, claiming Randall sexually assaulted her in the parking lot of the Rusty Scupper Restaurant.

— Oct. 27, 1981 — Randall is arraigned in Concord District Court for rape.

— Nov. 2, 1981 — Randall and Smith are the first witnesses to testify before a Middlesex County Grand Jury empaneled to hear evidence in the Ties case.

— Nov. 2, 1981 — With departmental troubles piling up and a grand jury actively probing the Ties affair, an embattled Police Chief Adamson resigns from his post.

— Nov. 6, 1981 — The alleged rape victim withdraws the complaints, and charges against Randall are dismissed.

— November, 1981 — A search for a new police chief begins and by Christmas selectman have at least 40 applicants for the position vacated by Adamson.

— Jan. 30, 1982 — Rowley Police Chief Philip Connors is hired as the town's chief lawman.

— April 1, 1982 — Officer Pugh, Sgt. James Lenney, and former officer William Adamson Jr. are suspenaed to appear before the grand jury hearing evidence in the Ties case. They do not testify, it is later revealed, because of what they say was a deal struck last fall between their attorney and the AG's office promising them that they would not be required to testify.

— April 12, 1982 — With the approval of the AG, Connors launches his own probe of the Ties incident. He orders Gintner to take a lie detector test.

— April 14, 1982 — Gintner is suspended from duty. He fails to take the polygraph after the chief refuses to give him an extension so that he can seek legal advice.

— April 20, 1982 — Sgt. Lenney is suspended

for failing to take a lie detector test.

— April 21, 1982 — Pugh is suspended for the same offense. Both Pugh and Lenney insist they would take the test if the lie detector company drops its position of requiring those tests to first sign a waiver excusing them from any liabilities. All three officers file grievances with the state labor relations commission.

— April 23, 1982 — Lenney and Pugh are fired from the force for failing to obey an order from the chief of police in taking a lie detector test, and failing to testify before a grand jury.

— April 23, 1982 — Connors reveals to the public that Randall and Smith last fall took and "unequivocally" passed a lie detector test.

— May 4, 1982 — Gintner is fired from the force for failing to obey an order from the chief by not taking the lie detector test.

— May 6, 1982 — Randall files a $16 million dollar lawsuit against 12 people. Randall, linking allegations to Ties and his rape "frame-up, sues ex-chief Adamson for $4 million, and seeks $1 million in damages from Lenney, Pugh, Gintner, Adamson Jr., Taylor, the alleged rape victim, her friend John McIntosh, Denise Leger, the town of Ayer, and Selectmen Francis Callahan, Thomas Casey and Murray Clark.

— June 23, 1982 — Chief Connors reveals that he has obtained an "important piece of evidence which supports the contention that Randall was the victim of a rape frame-up."

— July 8, 1982 — The AG excuses a Middlesex County Grand Jury hearing evidence in the Ties case. No vote was taken, and the case left open.

— July 13, 1982 — News breaks that the only piece of physical evidence, a buck knife found at the scene of the Ties break was missing from the Ayer Police station.

— July 14, 1982 — Pugh tells The Sun the the buck knife is in the custody of another police agency. Chief Connors claims it is still missing

— July 19, 1982 — Ex-Chief Adamson files a $625,000 law-suit against Randall for slander

# Ayer officer to appeal grievance to state

AYER — Police officer Stanley Randall will appeal to a state board of arbitration the selectmen's recent decision to turn down a grievance he filed against the board.

Randall filed the grievance in connection with the board's Feb. 8 appointment of Dennis MacDonald to a vacant sergeant's position.

Randall was also a contender for the position and the officer recommended by Police Chief Philip Connors for the position.

At last night's selectmen's meeting, selectmen Chairman Murray Clark quoted from Randall's letter, which said the board's decision on his grievance was "not acceptable to me." According to Clark, the letter said selectmen will be contacted by an arbitrator.

****See SJC decision at Local 346 v. Labor Relations Com'n, 391 Mass. 429 (1984).

The SJC found that the police were involved in criminal conduct in early 1979. That was the time period that they searched the Tyree apartment and testified against william Tyree at his 1980 trial.

# Court backs Ties-related police firings

BOSTON — The town of Ayer had the right to order police officers to take lie detector tests and to fire those that didn't, the state Supreme Court has ruled.

The decision announced Wednesday stemmed from a 1981-82 Ayer scandal, in which four officers, a quarter of the 15-member force, were suspected of vandalism at the Ties Construction Co., a company that stopped hiring them for off-duty details.

Edward Gintner, Sgt. James Lenney and Dominic Pugh, the three officers suspected of being involved, were fired when they failed to take the lie detector test ordered by a new police chief as part of an internal investigation.

William Adamson Jr., the fourth officer quit the force.

The International Brotherhood of Police Officers, Local 346, filed a complaint with the state Labor Relations Commission, charging the requirement was a prohibited practice under the work contract.

The state commission dismissed the complaint.

"We conclude that the commission did not err in determining that the town's decision to order polygraph testing was within the town's exclusive managerial prerogative," the court said.

A footnote to the 20-page unanimous decision written by Justice Ruth I. Abrams summed up the public view of the situation:

"There was evidence that law enforcement people would call the police department only when specific police officers were on duty, and that, although it was common practice for Ayer residents to notify the police when leaving a house unattended, they were reluctant to do so after this investigation became public."

After eight months of special police details, at time-and-a-half, the manufacturing company stopped the hiring practice. In February, 1980, it was broken into and vandalized to the extent of $25,000 to $45,000, the court reported.

The court said the alleged police crime came to light in 1981 in conversation between two officers, one of whom said the vandalism was in retaliation for the company's termination of their employment as private guards.

# Health board deep hole testing

PEPPERELL — The board of health has announced that it will begin witnessing of deep hole testing on March 24.

Any person who wishes to make an appointment or inquire about the testing requirements should call or visit the health board office at the town hall during regular office hours Monday through Friday from 8:30 a.m. to 1 p.m.

The board of health office will be closed for vacation Monday, March 14, through Wednesday, March 21, but the board will hold its regular weekly business meeting Tuesday, March 29, at 7 p.m.

**EXHIBIT**

**7**

I, William M. Tyree, on oath state that the
copies attached as pages to this exhibit are
true genuine copies of the documents they
purport to represent. Signed under the pains
and penalties of perjury on this date, *6-1-04.*

*William M. Tyree*
William M. Tyree, P.O. Box 100,
S. Walpole, Massachusetts, 02071

<u>DOCUMENTATION ASSERTING ACTUAL INNOCENCE CLAIM:</u>



Tyree makes a point during interview





William Tyree Jr.



William Adamson Sr.



Judge James Killam III

LOWELL SUN NEWSPAPER, LOWELL, MA. (May 1979)

## Aarhus, Peters face charges

# Tyree indicted in wife's murder despite judge's contrary ruling

**By NICK CARAGANIS**
Sun Staff

AYER — Judge James W. Killam III yesterday found no probable cause for murder charges against Pvt. William Tyree Jr. in connection with the Jan. 30 murder of his wife, but concluded there was evidence to warrant a probable cause finding against Pvt. Erik Y. Aarhus and stunned the proceedings by ordering murder charges filed against a third individual who had testified at the hearing.

A Middlesex County Grand Jury, three hours later, however, apparently thought otherwise as it indicted Tyree on first degree murder charges.

Killam's decision on Tyree, husband of murder victim PFC Elaine Tyree, stunned Asst. District Attorney Dante DeMichaelis who said after conferring with his Cambridge office that he would move immediately for a grand jury indictment against Tyree on murder charges.

The district attorney had the option of pursuing the case and seeking a direct indictment despite any decision at a probable cause hearing.

IN A SURPRISE move, the judge ordered murder charges be filed against Spec 4 Earl Michael Peters in connection with the Tyree murder.

Although Judge Killam's decision favored Tyree on the murder charge, the judge did find probable cause against him on lesser charges of accessory after the fact of murder, conspiracy with Peters to obstruct justice and obstruction of justice.

Tyree was arraigned on the



**WILLIAM TYREE**
... indicted

accessory after the fact of murder charge and ordered held at the Billerica House of Correction on $25,000 bail.

The judge ordered Ayer Police Chief William Adamson Sr. to execute complaints against Peters charging him with murder in the first degree, conspiracy with Erik Aarhus to murder Elaine Tyree, being an accessory before and after the fact of murder, conspiracy with William Tyree to obstruct justice and obstruction of justice.

Peters, a close friend of Tyree, testified during the hearing that Tyree spent more than three months looking for someone to kill his wife.

Peters, who through testimony was implicated with Tyree in numerous alleged crimes at Fort Devens, had also testified that Tyree asked him if he knew "a hired assassin to kill his wife."

The judge did find probable cause for guilt against Aarhus for murder in the first degree, accessory before the fact of murder and conspiracy with Peters to murder Elaine Tyree.

BUT, IN MAKING his decision against Aarhus, Judge Killam commented "I do not believe Aarhus wielded the murder weapon."

—Atty. Bernard Bradley, counsel for Tyree said he was surprised by the decision but added "it takes courage for a judge to find no probable cause."

—Tyree and Aarhus were arrested on Feb. 13 in connection with the Jan. 30 murder of Mrs. Tyree. Her body was found in the living room of her apartment at 104½ Washington St. She had been stabbed 17 times and her throat had been cut.

—Tyree was accused of hiring Aarhus to kill his wife for $5,000. — Peters led police to the alleged murder weapon in Aarhus' room at the Devens barracks.

—Subsequent to the arrest, Aarhus made an unsigned confession to police admitting the crime and implicating Tyree.

—In his written decision, Judge Killam said "the emergence of the alleged murder weapon with the blood of the victim still on it, preserved in two plastic bags, and found under the barracks-cot pillow of the defendant Aarhus, charged with the deed, which barracks are vulnerable to daily inspections, would strain the credibility of even the most gullible. The enlightened suspicion of 'frame' is inescapable."

Judge Killam said Pvt. Tyree had two friends, one of whom was Peters, "a regular visitor at the Tyree apartment who had the confidence of William Tyree and his intimate knowledge of the Tyree homes and habits together with his probable involvement with Tyree in various illegal activities suggests his involvement in the homicide."

ADDED JUDGE Killam "this same intimacy tends to explain Tyree's apparently accurate grasp of the events surrounding his wife's death. Peters' obvious guile and Tyree's apparent intellectual deficiency lead more believably toward Peters' leading and Tyree's following in various disclosures and discoveries subsequent to the homicide."

First Assistant Clerk of Court Joseph DeFreitas, who attended all of the sessions, said Killam's decision ended one of the longest probable cause hearings in the history of the Commonwealth which saw more than 40 witnesses testify and numerous exhibits introduced.

EXHIBIT

E

Trial Court
First Northern Middlesex Division
Erik V. Aarhus
William M. Tyree, Jr.
Case No. 271-272-273 of 1979
308 & 367

D E C I S I O N

     That the evidence ought to be taken in the light most favor-
able to the prosecution and that ordinary questions of credibility
ought not to be resolved in the usual probable cause hearing appears
to be settled law.  However, the emergence of the alleged murder
weapon with the blood of the victim still on it, preserved in two
plastic bags, and found under the barracks-cot pillow of the defen-
dant (Aarhus) charged with the deed; which barracks are vulnerable
to daily inspections would strain the credibility of even the most
gullible.  The enlightened suspicion of "Frame" is inescapable.

     The defendant Tyree had two "best friends."  First, Staff Sgt.
Menzie had nothing but concern for Tyree and his wife Elaine, to
the extent that Staff Sgt. Menzie all but forced Tyree to go through
with a listing of suspects and circumstances.  These, Tyree failed
to produce.  Second, Special 4, Earl Michael Peters, a regular vis-
itor at the Tyree apartment had the confidence of William Tyree and
his intimate knowledge of the Tyree homes and habits together with
his probable involvement with Tyree in various illegal activities
suggests his involvement in the homicide.  This same intimacy tends
to explain Tyree's apparently accurate grasp of the events surround-
ing his wifes' death.  Peters' obvious guile and Tyree's apparent
intellectual deficiency (as adduced from the testimony of most wit-
nesses) lead more believably toward Peters' leading and Tyree's
following in various disclosures and discoveries subsequent to the
homicide.

     I feel compelled to comment upon three pieces of demonstrative
evidence which I believed to have been manufactured to bolster a
marginally credible proposition in sequence of events.  These are
the three hand receipts, two for Peters' Remington 1100 autoloading
shotgun and one for defendant Aarhus' Buck 105 "Pathfinder" sheath-
type, hunting knife.  The customarily entered serial number of the
shotgun was not entered on the receipts which conveniently turned
up in the arms room trash can which conveniently had not been emp-
tied in two weeks preceeding a government interview with the armorer.
The receipt for Aarhus' hunting knife is dated on a day in December
of 1978 when there is no record of entry into the arms room and which
emerged from the hip pocket of the armorer during his testimony on

the witness stand.

In view of the foregoing, together with and after complete hearing of all the evidence, all parties being represented by counsel and with full opportunity to be heard and to examine witnesses, I make the following determinations and orders:

I.  Pvt. William Tyree.  Probable cause found and complaints of process to issue if not already issued.
    1.  Accessory after the fact of murder
    2.  Conspiracy with Earl Michael Peters to obstruct Justice
    3.  Obstruction of Justice

II. Pvt. Erik V. Aarhus.  Probable cause found and complaint and process to issue if not already issued.
    1.  Accessory before the fact of Murder
    2.  Murder in the first degree
    3.  Conspiracy with Earl Michael Peters to murder Elaine Tyree

III.Spec. 4, Earl Michael Peters.  I hereby order Chief William Adamson, Sr. or his designee to execute the following complaints against Earl Michael Peters, without further obligation as a result of this order and I hereby order Warren Birch, Esq., Clerk, or his designee to issue process as a result thereof against the said Earl Michael Peters.

    1.  Accessory before the fact of murder
    2.  Accessory after the fact of murder
    3.  Conspiracy with Erik V. Aarhus to murder
    4.  Murder of Elaine Tyree in the first degree
    5.  Conspiracy with William Tyree to obstruct justice
    6.  Obstruction of justice

IV. No probable cause found on complaints not enumerated.

I further hereby decline jurisdiction of any charges otherwise appropriate to the District Court Department and further hereby notify any and all defendants of their right to waive indictment and to proceed to trial upon the foregoing complaints.

May 15, 1979

_James W. Killam, III_
James W. Killam, III
Special Justice

JWK/mcw

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
No. 79-279 Civil

JOHN J. DRONEY AS HE IS
DISTRICT ATTORNEY FOR THE NORTHERN DISTRICT
AND WILLIAM L. ADAMSON, JR.

v.

FIRST NORTHERN MIDDLESEX DIVISION OF THE
DISTRICT COURT DEPARTMENT OF THE MASSACHUSETTS
TRIAL COURT AND THE CLERK OF THE SAID
FIRST NORTHERN MIDDLESEX DIVISION

## MEMORANDUM

The present action is by the District Attorney for the Northern District and the Chief of Police of the town of Ayer, plaintiffs, against the First Northern Middlesex Division of the District Court Department and the Clerk of the First Northern Middlesex Division, defendants. The complaint herein alleges in substance that the judge, after presiding at a probable cause hearing against William Tyree, Jr., and Erik Y. Aarhus, on his own motion caused six criminal complaints to be issued against a witness at that hearing, one Earl Michael Peters, and three criminal complaints to be issued against Tyree and Aarhus, seemingly connecting these latter with Peters. The plaintiffs seek a judgment that the criminal complaints are void and enjoining execution of process thereon. The defendants have moved to dismiss the complaint in the present action and the questions

2

involved have been briefed and argued with skill on both sides.

The motion to dismiss the complaint herein must be denied. As the criminal complaints were not signed and sworn to by a complainant before a neutral magistrate, they were issued unlawfully. See G. L. c. 276, § 22; G. L. c. 218, § 33. Cf. Commonwealth v. Haddad, 364 Mass. 795 (1974). It has been urged upon us that the judge had "inherent" authority to issue the criminal complaints, but no case cited to us has gone so far (see LaChapelle v. United Shoe Machinery Corp., 318 Mass. 166, 170 [1945]; Hurley v. Commonwealth, 188 Mass. 443 [1905]), and any such argument must be received with caution in the face of the statutes above cited.[*] (The question whether or how the judge might have proceeded lawfully to procure the issuance of such complaints is not before us.)

We think the instant action may be maintained in its present form. There is no force in the contention that Peters is an indispensable party not joined (see Mass. R. Civ. P. 19; 365 Mass. 765-766 [1974]). The District Attorney's standing to maintain the action is supported by the alleged facts that Peters is regarded as a major witness in the prosecution of Tyree and

_____

[*] Nor does Mass. R. Crim. P. 4, becoming effective on July 2, 1979, purport to grant the authority claimed here.

3

Aarhus (who have now been indicted and are awaiting trial) and that further processing of the criminal complaints in question would interfere materially with the prosecutorial function. In such a matter the views of the District Attorney on how best to proceed with the enforcement of the criminal laws are entitled to weight. The total situation was one in which it was proper for the District Attorney to apply to the single justice.

We deal here with the sufficiency of the complaint in this action on its face. As the complaint is sustained on that basis, it would be open to the defendants to file answers. But if inherent power does not exist, a question arises whether there would be any value in going on with the action to the stage of answer. However, counsel may act as they are best advised.

There have been statements and counter-statements about the motivations of the parties. As to these we express no opinion or any intimation of an opinion. The basic holding is that the criminal complaints are void under the statutes.

_____
Associate Justice

July 6, 1979

A true copy.

Attest:

July 6, 1979

_____
Assistant Clerk

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
NO.  79-279

JOHN DRONEY, ET AL.,
Plaintiffs

vs.

FIRST NORTHERN MIDDLESEX
DIVISION OF THE DISTRICT
COURT DEPARTMENT, ET AL.,
Defendants

AGREED JUDGMENT

Now come the parties in the above case and pursuant
to Mass. R. Civ. P. 58 agree to the following judgment.

1. Judgment shall be entered in accordance with the
memorandum of Kaplan, J. filed on July 6, 1979.

2. The execution of process marked as Exhibit H
to the plaintiffs' complaint shall be immediately
and permanently suspended and said process shall
be quashed.

3. The so-called complaints marked as Exhibit G
to the plaintiffs' complaint, including the six
complaints charging Earl Michael Peters with various
crimes, were issued contrary to Massachusetts law, are
null and void, and are stricken from the docket of
the First Northern Middlesex Division of the District
Court Department.

- 2 -

4. The individual defendants shall decline to exercise their jurisdiction to entertain applications for complaints brought by any party which seek to charge any individual or individuals with complicity in the murder of Elaine Tyree, unless so ordered by a justice or justices of the supreme judicial court.

5. The remaining allegations of the plaintiffs' complaint, including paragraphs 30, 31, 41, 42, 43, 44, 45 and 46, not being material to this agreed judgment, are stricken and all prayers for relief based upon the facts alleged in the remainder of the complaint are dismissed with prejudice against the defendants.

For the plaintiffs,

_Peter W Agnes Jr_

Peter W. Agnes, Jr.
Assistant District Attorney

For the defendants,

_Robert S. Potters_

Robert S. Potters
Special Assistant Attorney
General

_filed in
the Supreme Judicial
Court
11/20/79_

## AFFIDAVIT OF WILLIAM M. TYREE

I, William M. Tyree, on oath state:

1. That, on January 28, 2004, I did receive unsolicited the letter signed by Larry McCormack, dated March 13, 1980.

2. That, Mr. McCormack was the district attorney that prosecuted me for the murder of my late wife, Elaine Tyree.

3. That, the letter from Mr. McCormack was due to the handwritten letter of (Floyd) "Jack" Hebb, the father of my late wife. His letter is dated march 4, 1980. This letter was written four days after I was convicted before Judge William G. Young in Middlesex Superior Court for the murder of my late wife.

4. That, I have original hand written letters in my possession from Jack Hebb, and I can attest that the hand written letter dated March 4, 1980, is certainly the hand writing of Jack Hebb. There is no question of that. I will testify to the contents of thia affidavit in a court of law. The unsolicited material arrived in a Suffolk Superior Court (state) envelope.

Signed under the pains and penalties of perjury on this date, May 24, 2004.  End of statement/-------------------------------/

William M. Tyree
P.O. Box-100
S. Walpole, MA. 02071



**MICHAEL JOSEPH DONOVAN**
CLERK/MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
90 DEVONSHIRE STREET - 8TH FLOOR
BOSTON, MASSACHUSETTS 02109

U.S. POSTAGE
$00.37
H METER 4121136
BOSTON
MA
JAN 15'04

LEGAL

**WILLIAL M TYREE**
P.O. BOX 100
SOUTH WALPOLE, MA    02071

02071+0100 01

RECEIVED BY ME ON JAN. 28 2004

---

**MICHAEL JOSEPH DONOVAN**
CLERK/MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
90 DEVONSHIRE STREET - 8TH FLOOR
BOSTON, MASSACHUSETTS 02109

U.S. POSTAGE
$00.37
H METER 4121136
BOSTON
MA
JAN 15'04

LEGAL

Mr. William Tyree, W37519
MCI Cedar Junction
PO Box 100
South Walpole, Ma.    02071



02071+0100 01

# THE COMMONWEALTH OF MASSACHUSETTS

### OFFICE OF THE

## DISTRICT ATTORNEY FOR MIDDLESEX COUNTY

### CAMBRIDGE 02141

JOHN J. DRONEY
DISTRICT ATTORNEY

March 13, 1980

Mr. Floyd Hebb
12010 Iris Ave. S.W.
Cumberland, Maryland 21502

RE: CORRESPONDENCE OF MARCH 4, 1980.

Dear Mr. Hebb:

Your correspondence of March 4, 1980, to the Office
of the Middlesex District Attorney has been referred to me
for response.

You have previously informed me of the content's of the
correspondence in question. I would remind you of two thing's.
The conviction of William M. Tyree, Jr., on February 29, 1980,
is currently under appeal, and you are counting on the money
from the insurance policies to pay for the addition's to your
home. You need those addition's to provide a place for your
granddaughter to live. If you go to Judge Young with your
information you will not only jeopardize the conviction, but
will prolong, or ultimately forfeit any chance you will have
of attaining custody of your granddaughter, and the insurance
money. If you still desire to speak to Judge Young after you
review this letter I will consider your request. At this
point in time I discourage you from that course of action.

If there is any question or problem, please call. You
have my number.

Very truly yours,

Lawrence E. McCormack
Assistant District Attorney

pms

Mr. Droney,

Took a while to get started. Not much doing around here same routine guess you do about the same thing each day, not much else to do these days dont make much difference where you are. Edie recieved your letter and she also wrote a letter in return. It has about the same thing in it. I have been trying to tell you for some time. Earl Peters knows the story, he mentioned to me he killed Elaine and cut her throat! Not too much question about how she died. I ask about a lot of things. we would like to see Judge Young to talk to him on the matter. As Elaines father; not to mention because of my fathers death + circumstances as well. I feel it as the right thing to do. I know some would change thier minds about if Bill did it. I feel in due time he will

go free. I still don't understand your point for not wanting to do it. I know Bill has certian rights. Between you + I, is it personal? I cannot see the point. I can partly understand, but don't you see our part in the maze? Parents need to answer questions to the best of our ability. Edie + I still feel the same way. Elaine had her "affairs", and I really would like to raise that, and still havent succeeded. I have been writing on this 3 days. I am still full of questions, but I suppose they will be answered in some way. some times I am pretty crude in the manner of asking, blunt more or less. I also hope you will consider some things which are not written. There are flowers put on her grave every week, she is here in Spirit very much so. I have been

pretty busy so will close now take care.

Jack

## AFFIDAVIT OF WILLIAM M. TYREE

I, WILLIAM M. TYREE, ON OATH STATE:

1. THAT, IN APRIL 1979, I DID RECEIVE A LETTER FROM FLOYD (JACK) HEBB, THE FATHER OF ELAINE A. HEBB TYREE. THE LETTER WAS DATED APRIL 15, 1979.

2. THAT, ON JANUARY 30, 1979, ELAINE A. HEBB TYREE WAS MURDERED, AND FLOYD HEBB RELATED HIS KNOWLEDGE CONCERNING EVENTS SURROUNDING THE MURDER OF HIS DAUGHTER, AND EXPRESSED HIS VIEWS ON WHO KILLED HIS DAUGHTER.

3. THAT, A TRUE GENUINE COPY OF THE LETTER IS ATTACHED, AND IN PERTINENT PARTS STATED:

"...AS FAR AS ELAINE AND WHO COMMITTED MAYHEM I HAVE MY OWN THOUGHTS ABOUT WHO DONE IT, SHE TALKED ALOT ABOUT A CERTAIN PERSON AND WHO DID NOT WANT HER TO COME HOME, I DON'T KNOW WHY, IF SHE WOULD HAVE COME HOME SHE WOULD NOT HAVE GONE BACK TO MASS...I AM LIKE YOU BILL THEY FOUND A MOTIVE AND THEY WILL STICK TO IT UNTIL PROVEN WRONG. ALSO YOU ARE INNOCENT IN THE EYES OF THE COURTS UNTIL PROVEN GUILTY WHAT EVER. ELAINE MENTIONED THE SHOTGUN AND WHO IT BELONGED TO ALSO. SO I HAVE MY OWN IDEA'S..." (PAGE 4 OF THE LETTER UNDERLINED).

4. THAT, THE SHOTGUN BELONGED TO EARL MICHAEL PETERS. EVEN THE FATHER OF THE VICTIM UNDERSTOOD THE SHOTGUN THAT BELONGED TO PETERS, WAS A CRITICAL PIECE OF EVIDENCE, THAT PLACED PETERS AT THE CRIME SCENE.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.

WILLIAM M. TYREE
PRO SE
P.O. BOX-100
S. WALPOLE, MA. 02071

Hello Bill;

I haven't forgotten to write I have been bussier than a cat on a hot tin roof. Between my rail road work and other matters around the house boy! I have only been home eight hours on each end of my run then work 12 to 14 hrs. got old so I took off since last Tuesday. Have been running around here trying to get caught up on some house hold items and bills and so forth. That has taken eight hours or more each day but today is my day of rest from other matters, it is Sunday & Easter to boot. Tomorrow I have an appointment with the Dr. I've been run down ever since Jan. 30. been getting weak, no more strength than a sick cat Vale and I went to get fire wood and I couldn't even lift a log not like I use to Boy! have I gone down hill. I'll have to start using Dales Bar Bells again. Wish you were here I would put you to work. HA.HA. Dawn has been keeping every one happy especially at nite, she still wakes at nite and wants attention which you better belive she gets from Boss Edith. She is still growing 17½ inches and about as many pounds. She likes her baby food and likes to take a bath (like Elein) When its bed time she also wants to go to bed in her crib Better belive no where else either.

Case 1:04-cv-11380-RCL Document 9 Filed 06/28/2004 Page 88 of 112

Dawn is not to 11 o'clock often gaired she
hasn't stay awake that long at a time, as a normal
role she sleeps about 3 to four hrs. than awake
1½ to 2 hrs. during the day; sleeps about four to five
hrs at nite. Edie got up this morning with
her at 3:30 am, Both just now went back to bed 8:00 A.
Boy! what hours, about like mine. I like to try to
keep you informed of her (Dawn) and her activities
I may miss some but will think of them at
another time. Boy does she ever have the clothes
a friend of Dawns sure spends the money on her
We have more than she will ever use if she
changed 3 time a day every day. We want to go
to the grave site this after noon, I am not sure
about myself, I can't hardly take it yet but
hope to it sure is a problem with me I know
I can but will take a lot of time. We revived
all (some) of your clothing mostly Bags of letters
and so forth you can let me know what to
do with, I never read them but Elaine surely
must have loved you a whole bunch from the
amount of letters she wrote you. Would you
like to hear from her maybe I shouldn't ask
that but would be very nice for me to.
Well you will tire from reading this stuff now
but I wondered what to do with your clothes
they shipped them all, will save them for you
if you want or give them to the Church mission.
personal

I dont know what all you had but from the way Elain talked
you had a new sweeper, tape recorder, dishes, plates +
eating tools and so forth none of that stuff arrived
here, I wonder what has happened to all that wonder
if you could find out or do you know. It did belong
to you all, it was not shipped or something else
happened to it, if you want I could maybe possibly
find out, put a tracer on it. Well here goes Bill;
Last but not least, Bill as for Dawn maybe you
might have mis interped what Edie and I would like
for Dawn. I believe she wrote to you trying to explain
what we were trying to do. Do you know the law
is a funny thing. I know my cousin who use to
live next door wanted to take her brothers child
to raise, but they wouldn't let her have her, they put
her up for adoption, her brother was killed in an
auto accident in Texas, the mother was some where else.
What we wanted was the legal right to her to raise
her until ? what ever or what the out come of all
this is, I hope you would give us more credit than
to try to take her from you, If you do I dont know
what to think. She would be yours any time you
wanted her. the papers were just so some outsider
would not be able to step in and take her, you
know a lot of people are around like that. The last
thing in the world would be to try to deprive
you or any parent from the right to their child, I
hope you will think about this, talk about it
with some one legal + so forth. I know I can't be a
Dad to of her for to long, but I maybe could be a
good Grand pape. or PAPPY. of some sort, till better day.

As far as remarrying I am of the opinion Elaine would not have done so, she may have came here to stay with use you know that sort of runs in the family & dont know the reason but for the one + only love. As far as money your $20,000, would not replace you which would be the most important thing, I have learned that money is just a medium of exchange, I know a lot more people that would like it more than I would, I would rather have Elaine than the insurance I collected. Well I just got back from the cellar from baby sitting while my spouse slept. Bey even if Elaine wouldn't have wanted Dawn I would have felt like disowning her if she would have even thought of putting her up for adoption. Dont even want to dwell on it or think of such a thing. Bill I dont doubt you one tiny bit about you caring for Dawn properly, such a thing never entered my mind for I have always thought you was a man about all matters so. As far as Elaine and who committed Mayhem I have my own thoughts about who done it, she talked a lot about a certain person and who it was did not want her to come home, I dont know why, if she would have come home she would not have gone back to Mass

I am like you Bill they found a motive and they will stick to it until proven wrong, also you are innocent in the eyes of Courts until proven guilty what ever. Elaine mentioned the shot gun and who it belonged to also to I have my own Idea's. Now back to Dawn you cannot shuffel a small child not one of age 10 or 11 for it would disrupt their life to a point which wouldn't be very good for their health or personal being either I think it would make them feel insecure for one family to care for her one way then have a turn about for every one does not care for children the same way, you can see it around you every day;

So if you don't see what I am talking about which I
have no doubt, it would be better for all concerned
mostly Dawn if she were put in one spot and kept
there for her benifit. I do not want you to mis interpt
what I am saying either for we love her very much
and like I have written befor will provide for her the
best money can buy in all things. Like Edie wrote
you we do not and would not attempt to take her
from you in any way what so ever. As God is my maker
and witness witress this is the truth. Bill I see your
side of a lot of things most especially Dawn beleive me
for I don't see how any one l could turn her out and
not give her every bit of loveing care passible. What I
have said befor have your lawyer to interpet that
court order for you, and if he would have any
suggestions to make regarding it. You know Bill
there are a lot of ifs in the world but if we could
for see what the out come of things we could take the ifs
out of a lot of things, but I suppose that is the reason
that word was made, maybe to take up the slack in
a lot of things. I have a feeling we will be coming up
that way but I don't know for sure or when another if
Her Elaine ding dress never showed up in any of the Boxes.
Bill some one else has that picture we have looked through
all the pictures and it is missing also. Lik a lot of things.
Yes I know if you two were just getting started and could
have had a very fruitful and beeutful life together from
the way she talked. I only wish I would have married
early in life. I was 31 years old about 1/2 shot or gone
when I could have married when I was twenty and
in the prime of life. But another if Bill if I can
do any thing for you I can do nothing but try
what ever.

over

This should be getting to you writers.
Cramp you are proably getting tired of reading this.
Your Dad just called we had quite a talk they
want to bring Dawn up but she has been sick
Colick, cutting teeth, stomach ache she is to go
to the Dr. the 18th for her monthly or bimuel
check up. After we find out what the score
is we may be up for a day or two.
Sure is a hassel trying trying to keep up
with all things. do good to keep up with a
few o I was full of a lot of things to write
but some we will talk out when
I see you. So take care Bill.

                              Jack.

Couple of pictures in Her new Easter
out fit. One Birthday.



MAIL EARLY
ALWAYS USE
ZIP CODE

Mr. Wm. M. Tyree
I-16
Box 565
Billerich, Mo. 01821

FLOYD HEBB
12010 IRIS AVE. S.W.
CUMBERLAND, MD. 21502

To Whom It May Concern:

Shortly after noon on the 30th of January 1979, I was called to one of my rental units, by the police. They had recieved a report of trouble at 104½ Washington St.

As we approached the driveway at that address, I observed a person walking away from the area of that driveway. He was wearing a dark jacket and pants, which I believe were blue jeans, he also had on a red shirt under the jacket, and was carrying a box.

It was a man whom I believe was a fellow by the name of Peters, whom Elaine Tyree objected to very strongly and had moved from 24 Columbus St. to break up her husbands association with Peters.

Sincerly

Francis M Gardner

Notary Public
My Commission Expires: 11-5-87

# Complaints sought in '79 murder case

**By PATRICIA MONTMINY**
**Sun Staff**



THE SUN
Lowell, Mass.

★ ★ ★

The Suburbanite

17

Monday, July 6, 1987

AYER – District Court Judge Stanley Jablonski took under advisement a petition filed by the mother of convicted murderer William Tyree Jr. to issue homicide complaints against a former suspect in the 1979 slaying of her daughter-in-law, and against former Ayer Police Chief William Adamson Sr. for perjury and obstruction of justice in connection with the case.

Judge Jablonski made no decision following a closed-door hearing that lasted more than an hour, and in which no witnesses were called.

Adamson appeared at the hearing represented by Town Counsel Robert Gardner and his personal attorney, William McKenney.

The former suspect, Earl M. Peters, who now lives in Pennslyvania, was not at the hearing.

Tyree is serving a life sentenced at Cedar Junction state prison in Walpole in connection with the murder of his wife, Elaine Tyree, at the couple's apartment at 104½ Washington St., Ayer. Tyree was a Green Beret and his wife a private.

Tyree contends that his wife was an informant for the Army's criminal investigation division, and the notebooks and diaries she kept on other soldiers were responsible for her murder.

At a pretrial hearing 10 days ago, Tyree's mother, Gaye Tyree, was denied motions for the issuance of subpoenas for her son, Eric Aarhus, another soldier convicted in connection with the murder and serving a life sentence at Norfolk state prison, and Judge James Killam, who handled the probable cause hearing.

Prior to the hearing, Mrs.

Tyree moved to have Assistant District Attorney David Meier and Gardner removed from the proceeding. Both motions were denied.

Mrs. Tyree contended that Gardner's presence constituted a conflict of interest, since Gardner had notorized an affidavit made by his uncle, Ayer businessman Francis Gardner. Francis Gardner, in that affidavit, claimed that he saw Peters in front of the Tyree home moments after the murder. Francis Gardner was William Tyree's landlord.

Judge Jablonski questioned both lawyers, who stated they felt their presence did not amount to a conflict.

## Town's agreement

Gardner also said that he was at the hearing representing Adamson in accordance with an agreement the town made with Adamson. He said that Adamson's agreement entitled him to legal representation in connection with any issues arising out of his tenure as police chief.

Tyree's lawyer, Concord Attorney Damon Scarano, filed an objection with Judge Jablonski's decision prohibiting Tyree's appearance. Scarano also addressed some of the current petitions before the court in connection with the Tyree case.

Judge Jablonski did allow a request made by Wanda Brackett that she be allowed to remain in the courtroom for the proceeding. Brackett said that she was the fiancee of Aarhus, and held his power of attorney.

Also present were Bryzinski, State Police Troopers William Lisano and and Rodney Hendrigan.

## AFFIDAVIT OF ERIK AARHUS

I, Erik Aarhus, do hereby attest to the following:

1. That in February 1980 I was convicted of killing Elaine Tyree. As a result of my direct appeal, I was not able nor available to testify for William Tyree, who was named as my codefendant in this case.

2. That I am willing to testify in behalf of William Tyree, if he is granted a new trial related to the murder of his wife. My testimony at the new trial would be that William Tyree was not involved in the murder of his wife. This would have been the testimony that I would have provided to the court, in 1980, if I had been available to testify for William Tyree at the time of his original trial.

3. That I have told several people that William Tyree was not involved in the murder of his wife, Elaine Tyree, but have not been given the opportunity to testify to this fact in court.

4. That I have provided this affidavit of my own free will, without promise, inducment, or threat to my life, and will testify to the contents of this affidavit in court.

11/8/95

Erik Aarhus

Signed under the pains and penalties of perjury

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 79-1383

### COMMONWEALTH

vs.

### WILLIAM M. TYREE, JR.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION OF ORDER DENYING THIRD MOTION FOR NEW TRIAL

Although styled a motion for reconsideration of order denying his third motion for a new trial, the defendant's motion asserts several new arguments and accordingly, it is treated as a fourth motion for a new trial. In his third motion for a new trial, defendant argued that the confession of co-defendant Erik Aarhus was erroneously admitted in evidence. The motion failed because the trial transcript established that the Aarhus confession had been excluded from evidence.

In this motion the defendant seeks a new trial alleging that the investigating officers testified that they spoke with Aarhus and then arrested the defendant. He argues that he was denied his right to confront Aarhus, that he was denied the right to call Aarhus as a witness because of the pendency of Aarhus' appeal from his own conviction and that the prosecution rendered defense counsel ineffective and defense counsel was ineffective for failing to move for a postponement of his trial until Aarhus became available to testify. In connection with this motion Tyree also submitted a November 8, 1995 affidavit of Aarhus. The motion is **DENIED**.

Like the issue raised in defendant's third motion for a new trial, these issues were not raised on appeal, see Commonwealth v. Tyree, 387 Mass. 191 (1982), or in any of defendant's three prior motions for a new trial and for reconsideration. Mass. R. Crim. P. 30(c)(2). They are therefore waived. Commonwealth v. Curtis, 417 mass. 619, 626 (1994). In any event, the issues raised by defendant are without merit. First, testimony by the investigating officers that they

4/26/96 copy sent
to Dept + a DA Cunis

RA-6

2

spoke with Aarhus and then arrested the defendant was not admitted in evidence. (Trial

Transcript, Day 12 at 1768-71). Further, defense counsel did object to this testimony - his

objection led to its exclusion. Id. The defendant also argues that his counsel was ineffective for

failing to move for postponement of his trial until Aarhus was available as a witness. At a voir-

dire during the trial Aarhus asserted his Fifth Amendment rights and refused to testify. The trial

judge found a valid exercise of the privilege. (Trial Transcript, Day 6, 877 et seq.) Aarhus'

appeal was pending at the time as were other related charges against him. In these

circumstances, the defendant's assertion that his counsel was ineffective because he failed to

move for postponement is also without merit.

The defendant has filed a conclusory affidavit of Erik Aarhus dated November 8, 1995 in

which Aarhus states that he is willing to testify at a new trial that "William Tyree was not

involved in the murder of his wife." Aarhus was also convicted of first degree murder in

connection with Elaine Tyree's death, Commonwealth v. Aarhus, 387 Mass. 735 (1982). In

Aarhus' confession, he detailed Tyree's involvement in the murder of his (Tyree's) wife. Id. at

740. The confession directly contradicts Aarhus' recent conclusory affidavit, as do the

surrounding circumstances, including Tyree's conduct before and after the murder and his

statements to investigators. (Id. at 740). (Detailed in Commonwealth v. Tyree, supra 387 Mass.

at 197-205) In these circumstances, the Aarhus affidavit warrants neither an evidentiary hearing

nor a new trial.

For the reasons stated herein the motion is **DENIED**.

Diane M. Kottmyer
Justice of the Superior Court

**DATED:** April 23 1996
:sh

RA- 7

*PROOF THAT THE MAN SEEN RUNNING FROM THE ELAINE TYREE MURDER SCENE WASNT AARHUS.*

## AFFIDAVIT OF WILLIAM M. TYREE

I, WILLIAM M. TYREE, ON OATH STATE:

1. THAT, ON JANUARY 30, 1979, ELAINE A. HEBB-TYREE WAS MURDERED.

2. THAT, A WITNESS IDENTIFIED AS VIAS WILLIAMS, A SOLDIER ASSIGNED TO THE 39th COMBAT ENGINEERS, FORT DEVENS, MA., SAW A SUSPECT RUN FROM THE DIRECTION OF THE TYREE APARTMENT AT THE TIME OF THE MURDER, SEE ATTACHED* TRANSCRIPT pp. II-16 - II-21.

3. THAT, THE DISTRICT ATTORNEY, LARRY McCORMACK, ADMITS ON pp. II-18 - II-19, THAT AFTER THE POLICE RECEIVED THE FLAWED CONFESSION FROM ERIK AARHUS ON FEBRUARY 13, 1979, THE POLICE STOPPED LOOKING FOR THE SUSPECT THAT VIAS WILLIAMS SAW RUN FROM THE DIRECTION OF THE TYREE APARTMENT.

4. THAT, THE SUSPECT THAT VIAS WILLIAMS SAW RUNNING FROM THE CRIME SCENE WAS DESCRIBED AS 6'0"-6'2", DARK SKINNED (POSSIBLY SPANISH), 160-165 POUNDS, JET BLACK HAIR.

5. THAT, ERIK AARHUS IS WHITE, AND STAND 5'6"- 5'8", 140-145 POUNDS, WITH BROWN HAIR.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS DATE,
5/10/96 .

WILLIAM M. TYREE
PRO SE
P.O. BOX-100
S. WALPOLE, MA. 02071

**TRANSCRIPT REFERRED TO IS, COMMONWEALTH v. AARHUS, SUPPRESSION HEARING, DATED DECEMBER 7, 10, 1979, JUDGE MORSE; ADA McCORMACK; DEFENSE COUNSEL, JOSEPH SPADAFORA.

* VIAS WILLIAMS NEVER SAW EARL MICHAEL PETERS. *

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS:                          SUPERIOR COURT

No. 79-1383-1384    COMMONWEALTH versus WILLIAM TYREE, JR.

No. 79-1385-1386    COMMONWEALTH versus ERIK AARHUS

                              Before:  YOUNG, J
                                       w/o Jury

                    ─────────────────────────

                           THIRD DAY
                      MOTION TO RECONSIDER

                    ─────────────────────────

APPEARANCES:

        Lawrence McCormick, Esq., Assistant District
Attorney, Cambridge, Massachusetts, for the Commonwealth.

        William Bradley, Esq., Massachusetts Defenders
Committee, Cambridge, Massachusetts, for Defendant Tyree.

        William Kittredge, Esq., 34 Pope Street, Hudson,
Massachusetts, for Defendant Aarhus.

                    ─────────────────────────

                    Superior Court
                    Cambridge, Massachusetts
                    Monday, January 21, 1980

1                    I N D E X

2   WITNESS:                  DIRECT   CROSS   REDIRECT   RECROSS

3   WILLIAM ADAMSON              216

4   JOHN DWYER                   257    277      279

5   PAT KEENE                    283    300

6

7

8

9

10

11

12                 E X H I B I T S

13  NUMBER           DESCRIPTION                          PAGE

14  E for         Transcript                              216
      Identification

15

16

17

18

19

20          Patrick Keane, Massachusetts State
            Police. Assigned to the Office of the
            Middlesex District Attorney for the
21          time period of the investigation into
            the murder of Elaine A. Hebb-Tyree.

22

23

24

25

1    Q    All right.

2        Mr. Keene, did you in the course of this investigation

3    have an opportunity to talk with a Mr. Williams?

4    A    Yes, sir, I did.

5    Q    Will you tell us his name, sir?

6    A    His name is Vais Williams, to the best of my recollection,

7    sir.

8    Q    Can you tell us when you had the opportunity to talk

9    with him, Mr. Keene?

10    A    It was some time prior to the 13th and after the 31st.

11    I couldn't give you a day or a date without seeing my

12    notes.

13    Q    Can you tell us your purpose in talking to Mr. Williams?

14    A    Yes, sir.

15    Q    Please.

16    A    At that time I believe I was with a couple of other

17    officers and we were just conducting door-to-door search,

18    if anybody had seen anything in the area.  And Mr. Williams

19    lived in an apartment complex next to the scene of the

20    crime.  And just in the course of our investigation to

21    talk to everybody that lived in the area and that is how

22    we came upon Mr. Williams.

23    Q    Did Mr. Williams, just yes or no, if you know, did

24    Mr. Williams make an ID of an individual being in that

25    vicinity on the day of the crime?

294

1   A    No, sir.

2   Q    Did Mr. Williams give you a description of anyone that

3        he saw in that vicinity on the day of the crime?

4   A    He gave us a description of unknown person.

5   Q    Was this description, was the description that

6        Mr. Williams gave you, did the description that

7        Mr. Williams gave you fit the description of Mr. Aarhus?

8   A    I would have to say no, sir.

9   Q    Mr. Keene, at the time that you were in the room of

10       Mr. Aarhus on the occasion when the knife was discovered

11       do you recall photographs being taken?

12  A    The night of the search?

13  Q    Yes, sir.

14  A    Yes, sir.

15  Q    All right. Were you in the room while the photographs

16       were being taken?

17  A    I believe I was, yes, sir.

18  Q    All right.  Can you tell me who took the photographs?

19       Who used the camera?

20  A    I believe it was Agent Mason, I believe, sir.

21       Agent Mason.

22  Q    Did you assist in any way at the time of the taking of

23       those photographs?

24  A    No, sir.

25  Q    But you were in the room while they were being taken?

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                    SUPERIOR COURT
NO. 79-1385 - 1386

COMMONWEALTH

vs

ERIK AARHUS

MOTION TO SUPPRESS

BEFORE:    MORSE, J.

APPEARANCES:

    Lawrence McCormack, Assistant District Attorney,
      representing the Commonwealth

    Joseph Spadafora, Esq.,
      representing the Defendant

                    December 7, 1979
                    Cambridge, Massachusetts

*Alice C. McDonald*
Official Court Reporter
Middlesex Superior Court
Cambridge, Massachusetts 02141

II-2

INDEX

| WITNESS | DIRECT | CROSS |
|---|---|---|
| William Shelton | 4 | 11 |

page 28 it says:  <u>Let me tell you something.  We haven't told anybody but we have got a witness.  The defendant asked who is it.  This is going to be our ace in the hole.</u>

And he identifies what the witness is going to testify to, that the witness would identify him by clothing.

Shortly after that Aarhus admits the offense.

Does the Commonwealth indeed have a witness that is referred to in that question?

MR. MC CORMACK:  The Commonwealth had a witness.

THE COURT:  Who was that?

MR. MC CORMACK:  - which was an individual in th adjoining apartment building at 104-1/2 Washington Street.  There is an area where one goes into a drive way, and it opens to sort of a rectangular area inside and there is an apartment.  As you are looking in the driveway there is an apartment building over to your right, and there is one almost as you go straight in. <u>There was a witness, an individual by the name of B. Williams</u> who was on one of the upper floors in the apartment building as you go directly in, who observ someone running from the back of the building.

THE COURT:  That witness whose statement you ha

II-17

would be able to desribe clothing?

MR. SPADAFORA:  Your Honor--

THE COURT:  I will give you a chance to respond in a minute.

What did that witness say other than he saw a person running from the building?

MR. MC CORMACK:  I believe that witness -- and I haven't talked to that witness, but I believe that witness described the clothing.

THE COURT:  Do you have a signed statement of tha witness?

MR. MC CORMACK:  I do not, your Honor.

THE COURT:  Do you have a signed statement from t witness?

MR. SPADAFORA:  I have the report signed by the police, Judge, who interrogated that witness, and it was brought out in the probable-cause hearing and somewhere it's in the transcript.  But the witness' statement was that the person running from the building, or in the vicinity of the building, was six feet plus tall and had Army fatigues.  There was a big issue at the probable-cause hearing.  Williams never showed up.

There is a statement -- I dont have it with me--

but it's somewhere, from the police officer who took

it from Mr. Williams, who shortly thereafter dis-

appeared.  I might suggest to the Court that in no

way whatsoever would it even remotely relate to Mr.

Aarhus' stature or build or what he told the police

what he was wearing.

THE COURT:  That wasn't the issue I was asking the

District Attorney about.

MR. SPADAFORA:  Well, in any case, your Honor, as

far as I'm concerned it was a witness that would have

been brought by the defense, not by the Commonwealth.

THE COURT:  Well, the statement in the record is

by the questioner: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ they've got a witness, and

▓▓▓▓▓▓ whether the witness is persuasive or not,

whether that was a true statement and that they have a

▓▓▓▓▓▓

MR. MC CORMACK:  There is no question, if your

Honor please, they did have a witness, Mr. Williams.

THE COURT:  What happened to Williams?

MR. MC CORMACK:  I think what happened, if your

Honor please, is that after Mr. Aarhus gave that

statement, they just stopped and they didn't carry

that through any further.  I think there may have been

some question as to whether or not ~~the description~~ ~~matched up.~~ But, I think when they got the statement ~~on the 13th of February,~~ they didn't carry this ~~thing any further, and they stopped~~ed.

MR. SPADAFORA: Your Honor, let me suggest this to you. Out of forty witnesses at the probable-cause hearing, Mr. Williams was never called by the prosecution to lend credence, that that is somewhat puffery, that statement.

THE COURT: There is a difference between being puffery and being a false statement or trickery.

MR. SPADAFORA: Let me say, my personal opinion in view of seeing every witness that the Commonwealth intended to bring, that it's so much trickery-- if that's the word.

MR. MC CORMACK: I take umbrage with that.

THE COURT: I have to decide this on the basis of evidence, not counsel's statements.

Here it is, at the top of page 26, the question begins: Any time something like this happens, the first thing people start looking at, etc. etc. What you don't see, a lot of other people don't see-- when they read the paper and the circumstances, why it happened. These are the things that weigh very

II-1

heavily on a Judge.

Later on, at the bottom of page 27: There is a
big blank difference between charge of murder and
being charged with being accessory after the fact.
Okay, if you did it, you're it. Case closed. There
is more than one person involved here.

MR. SPADAFORA: Your Honor, if it would help,
on the bottom of page 28 is a description of what the
police said the witness would have said. ▒▒▒▒▒▒▒▒▒

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

THE COURT: Do you know the source of that
statement about the idea of breakdown, or jean jacket
or life jacket?

MR. MC CORMACK: I think what the problem is
that the transcription is certainly not the greatest.
I have to listen to the tape at this particular point
to determine who is making that statement.

MR. SPADAFORA: Your Honor, if I may suggest to
the Court, I believe that particular question, whatev
it is, the statement, is made by Chief Adamson and
it certainly couldn't pertain to the potential witnes

II-21

Williams.  If the Commonwealth ever had another one
it certainly has never come up in any of the discovery.

THE COURT:  On the face of it, on the evidence
before me, I am not persuaded that is a misleading
or deliberately false statement.  It may have been
over-generous as to what the chief actually had,
but having read this transcript carefully, having
listened to the entire tapes, and the evidence of the
witnesses concerning the warnings, I am satisfied that
the statement was made freely, willingly and voluntarily
and I will deny the motion to suppress and you may
note your objection.

MR. SPADAFORA:  Thank you very much, your Honor.

----------------

CERTIFICATE

I certify that the foregoing is a complete and accurate
transcription of my stenotype notes of the motion to
suppress in the case of Commonwealth vs Erik Aarhus.

Alice C. McDonald
Official Court Reporter

# 'He Didn't Commit Suicide'

## Investigations: Anguished relatives insist the U.S. military bungled probes and covered up murders

HE WAS A FIGHTER JOCK, A DECORATED veteran of 221 combat missions over Vietnam and third in command at the El Toro Marine Corps Air Station in El Toro, Calif. But on Jan. 22, 1991, Col. James Sabow, 51, was found shot dead in the backyard of his home, the victim of a blast to the head from his own shotgun. Sabow had been watching television coverage of the Persian Gulf War when his wife, Sally, left the house at 8:30 a.m. As she walked out the door she heard him answer the phone and repeat his name as though there were no response. When she returned an hour later, he was dead. The U.S. Marine Corps and the Naval Investigative Service concluded Sabow had committed suicide. His brother, Dr. John David Sabow, says the colonel was murdered because "he knew too much" about illegal covert operations at the base.

The body of marine Second Lt. Kirk Vanderbur was found at a private shooting range in Hubert, N.C., in February 1992. He had been shot twice—once in the abdomen by a shotgun loaded with birdshot, then in the head with a .223-caliber Ruger rifle. Despite the fact that the guns lay eight to 10 feet apart, the Naval Investigative Service concluded Vanderbur had committed suicide—which meant he must have crawled over to the Ruger rifle while badly wounded in a second attempt to take his own life. Vanderbur's mother, Lois, says there was no sign her son was despondent and that he sent a cheery letter to his younger brother—"little squirrelly bro"—the day before his death. "We don't know what happened, but we know he didn't commit suicide," she says.

These cases and dozens of others raise troubling questions about life—and death—in the military. According to The Philadelphia Inquirer, which printed a lengthy series on the controversy last year, 3,375 members of the U.S. armed services were listed as suicides between 1979 and 1993—and of those, grieving relatives have challenged the military's official findings in more than 60 cases. The families charge that military investigators have often lost or mishandled crucial evidence or failed to perform autopsies and laboratory tests. In some cases, they contend, investigators have attempted to cover up scandals or criminal conspiracies in the ranks. The relatives have formed a national organization called Until We Have Answers to protest what they see as the Pentagon's slipshod handling of suicide cases, and some have gone to extraordinary lengths to dispute the military's claims. The parents of marine Cpl. John MacCaskill Jr., an embassy guard found shot in a bar in El Salvador in 1988, have had his body exhumed twice in an attempt to prove he was murdered. "These families are not off the wall," says Frederick McDaniel, a former army lieutenant colonel who once commanded a criminal-investigations unit. "They've been treated very shabbily. The bottom line is, nobody gives a damn."

Sabow's immediate family filed suit against the navy and the Marine Corps, seeking damages for the intentional infliction of emotional distress and conspiracy to cover up his murder. The Sabows contend navy investigators ignored physical evidence that proves murder, including the fact that Sabow's fingerprints were not found on the shotgun or on the two shells in its firing chamber. Gene Wheaton, a former military investigator retained by the Sabow family, says the navy's criminal-investigation service is notably less competent than those of the other armed services. "They don't think like cops—they think like bureaucrats," he says. "They want to go in and close the whole thing out." Wheaton also claims the marine brass is concealing a pattern of covert arms smuggling that is "a continuation of Iran-contra"—and he implies that Sabow must have known something illegal was going on.

Golf junkets: But Sabow may well have had a motive for suicide. According to his brother, the colonel was removed from his post as assistant chief of staff at El Toro about five days before his death and was under investigation for the unauthorized use of marine aircraft. The purpose, reportedly, was golf junkets, not international arms smuggling. (The Marine Corps refused to comment on all aspects of the Sabow case.) J. D. Sabow says these charges were "phony and trumped up" and insists his brother "was going to blow everything out at a court-martial." Even so, Sabow faced the likelihood of an inglorious finale to a distinguished military career—and his brother, who alleges that marine officials conspired to wreck his own career as a neurologist, is clearly bent on avenging a family tragedy.

There may be a plausible explanation for Kirk Vanderbur's apparent suicide as well. David Grimes, a private investigator hired by the family, believes Vanderbur accidentally discharged the shotgun, opening a gaping wound in his stomach—and then, in excruciating pain, struggled to the Ruger rifle to kill himself. Why? As Grimes explains it, Vanderbur knew that he was slowly bleeding to death and that there was no one around to help him: the shooting range had closed for the weekend. "I can see putting an end to it," Grimes says. But, he says, Lois Vanderbur "didn't like the fact that I didn't find it was murder."

Under pressure from the families and from Congress, Pentagon officials are reviewing about a dozen suicide cases that still seem questionable. But the public's skepticism about the integrity and competence of military officialdom probably means that such investigations will always be emotional minefields—and a source of anguished controversy for years to come.

NINA ARCHER BIDDLE in Chicago



GARY ANDERSON—SIOUX CITY JOURNAL
**Minefields:** Vanderbur with her son's photo, Sabow