49

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS:

SJC 2435
SUPERIOR COURT
CR. 79-1383

1-176

COMMONWEALTH

vs

WILLIAM TYREE, JR.

Before:  YOUNG, J
and Jury

APPEARANCES:

      Lawrence McCormick, Esq., Assistant District Attorney, Cambridge, Massachusetts, for the Commonwealth

      Bernard Bradley, Esq., Massachusetts Defenders Committee, 189 Cambridge Street, Cambridge, Massachusetts, for the Defendant.

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX
MAR 4 - 1981
CLERK

Superior Court
Cambridge, Massachusetts
Friday, February 8, 1980

1   cannot do it. They are using every means at their
2   disposal. There are certain limitations. I think the
3   defendant is entitled to certain limitations. They should
4   be bound to give him a fair trial. Now they say he
5   should come into court and testify.
6       MR. McCORMICK. If your Honor please, I don't agree
7   with Mr. Bradley's response.
8       THE COURT. Your positions are noted for the record.
9   So long as we do not delay the trial in any way.
10      MR. BRADLEY. I object to the filing at this time.
11      THE COURT. Very well, your objection is noted.
12  Let's begin.

13  _____

15      THE CLERK. Are you Corrine Lauziere?
16      THE JUROR. Yes.
17          (Juror sworn by the clerk)
18      THE COURT. Miss Lauziere, good morning.
19  What we do now is ask you some additional questions
20  to see that it is appropriate that you sit as a juror
21  in this case.
22      Maybe you could tell us just a little bit about
23  your work?
24      THE JUROR. I work at Northeastern Distributors.
25  I do clerical work.

COMMONWEALTH OF MASSACHUSETTS                SJC 24357

MIDDLESEX, SS:                                SUPERIOR COURT

No. 79-1383-1384    COMMONWEALTH versus WILLIAM TYREE, JR.

No. 79-1385-1386    COMMONWEALTH versus ERIK AARHUS

Before:  YOUNG, J
         w/o Jury

---

THIRD DAY
MOTION TO RECONSIDER

---

APPEARANCES:

    Lawrence McCormick, Esq., Assistant District Attorney, Cambridge, Massachusetts, for the Commonwealth.

    William Bradley, Esq., Massachusetts Defenders Committee, Cambridge, Massachusetts, for Defendant Tyree.

    William Kittredge, Esq., 34 Pope Street, Hudson, Massachusetts, for Defendant Aarhus.

---

Superior Court
Cambridge, Massachusetts
Monday, January 21, 1980

| | | |
|---|---|---|
| 1 | Q | All right. |
| 2 | | Mr. Keene, did you in the course of this investigation |
| 3 | | have an opportunity to talk with a Mr. Williams? |
| 4 | A | Yes, sir, I did. |
| 5 | Q | Will you tell us his name, sir? |
| 6 | A | His name is Vais Williams, to the best of my recollection, |
| 7 | | sir. |
| 8 | Q | Can you tell us when you had the opportunity to talk |
| 9 | | with him, Mr. Keene? |
| 10 | A | It was some time prior to the 13th and after the 31st. |
| 11 | | I couldn't give you a day or a date without seeing my |
| 12 | | notes. |
| 13 | Q | Can you tell us your purpose in talking to Mr. Williams? |
| 14 | A | Yes, sir. |
| 15 | Q | Please. |
| 16 | A | At that time I believe I was with a couple of other |
| 17 | | officers and we were just conducting door-to-door search, |
| 18 | | if anybody had seen anything in the area. And Mr. Williams |
| 19 | | lived in an apartment complex next to the scene of the |
| 20 | | crime. And just in the course of our investigation to |
| 21 | | talk to everybody that lived in the area and that is how |
| 22 | | we came upon Mr. Williams. |
| 23 | Q | Did Mr. Williams, just yes or no, if you know, did |
| 24 | | Mr. Williams make an ID of an individual being in that |
| 25 | | vicinity on the day of the crime? |

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                           SUPERIOR COURT
NO. 79-1385 - 1386


COMMONWEALTH

vs

ERIK AARHUS


MOTION TO SUPPRESS


BEFORE:   MORSE, J.


APPEARANCES:

    Lawrence McCormack, Assistant District Attorney,
      representing the Commonwealth

    Joseph Spadafora, Esq.,
      representing the Defendant


December 7, 1979
Cambridge, Massachusetts

*Alice C. McDonald*
Official Court Reporter
Middlesex Superior Court
Cambridge, Massachusetts 02141

II-1

page 28 it says: <u>Let me tell you something. We haven't told anybody but we have got a witness. The defendant asked who is it. This is going to be our ace in the hole.</u>

And he identifies what the witness is going to testify to, that the witness would identify him by clothing.

Shortly after that Aarhus admits the offense.

Does the Commonwealth indeed have a witness that is referred to in that question?

MR. MC CORMACK: The Commonwealth had a witness.

THE COURT: Who was that?

MR. MC CORMACK: - which was an individual in the adjoining apartment building at 104-1/2 Washington Street. There is an area where one goes into a driveway, and it opens to sort of a rectangular area inside and there is an apartment. As you are looking in the driveway there is an apartment building over to your right, and there is one almost as you go straight in. <u>There was a witness, an individual by the name of B. Williams</u> who was on one of the upper floors in the apartment building as you go directly in, who observed someone running from the back of the building.

THE COURT: That witness whose statement you ha

II-18

but it's somewhere, from the police officer who took it from Mr. Williams, who shortly thereafter disappeared. I might suggest to the Court that in no way whatsoever would it even remotely relate to Mr. Aarhus' stature or build or what he told the police what he was wearing.

THE COURT: That wasn't the issue I was asking the District Attorney about.

MR. SPADAFORA: Well, in any case, your Honor, as far as I'm concerned it was a witness that would have been brought by the defense, not by the Commonwealth.

THE COURT: Well, the statement in the record is by the questioner: ~~[redacted]~~ ~~[redacted]~~ we have got a witness, and ~~[redacted]~~ whether the witness is persuasive or not, ~~[redacted]~~ true statement and that they have a ~~[redacted]~~

MR. MC CORMACK: There is no question, if your Honor please, they did have a witness, Mr. Williams.

THE COURT: What happened to Williams?

MR. MC CORMACK: I think what happened, if your Honor please, is that after Mr. Aarhus gave that statement, they just stopped and they didn't carry that through any further. I think there may have been

11-

heavily on a Judge.

Later on, at the bottom of page 27: There is a big blank difference between charge of murder and being charged with being accessory after the fact. Okay, if you did it, you're it. Case closed. There is more than one person involved here.

MR. SPADAFORA: Your Honor, if it would help, on the bottom of page 28 is a description of what the police said the witness would have said. [redacted]

THE COURT: Do you know the source of that statement about the idea of breakdown, or jean jacket or life jacket?

MR. MC-CORMACK: I think what the problem is that the transcription is certainly not the greatest. I have to listen to the tape at this particular point to determine who is making that statement.

MR. SPADAFORA: Your Honor, if I may suggest to the Court, I believe that particular question, whatev it is, the statement, is made by Chief Adamson and it certainly couldn't pertain to the potential witnes

**SWORN STATEMENT**

For use of this form, see AR 190-45; the proponent agency is Office of The Deputy Chief of Staff for Personnel.

| LOCATION | DATE | TIME | FILE NUMBER |
|---|---|---|---|
| Fort Devens, Massachusetts | 30 Nov 78 | 0945 | |

| LAST NAME, FIRST NAME, MIDDLE NAME | SOCIAL SECURITY NUMBER | GRADE/STATUS |
|---|---|---|
| AARHUS Erik Y. | 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 | SP4 E4 |

ORGANIZATION OR ADDRESS
Service Company, 10th Special Forces Group (Abn), 1st Special Forces, Fort Devens, M

I, SP4 E4 ERIK Y. AARHUS, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

Q. Are you aware that you are here at the JAG Office this morning to answer certain questions concerning your knowledge about a larceny that occurred in your company sometime back in June of 1978?
A. Right.

Q. Are you making this statement of your own free will to me, CPT David P. Carey?
A. Yes.

Q. Did you make a statement to MPI Mackles regarding this larceny on 23 June 1978 at approximately 1315 hours?
A. Yes.

Q. Do you recall the contents of that statement?
A. Yes, I was saying that at the time he sold me a determined length of rope for $15.

Q. In this statement, did you admit that you purchased this rope from a SP4 Tyree?
A. Yes, I did.

Q. Did you state that you purchased this rope from Tyree on Tuesday, 20 June 1978?
A. Yes.

Q. Did you further say that you picked up the rope close to Tyree's desk in the FST #2 building?
A. Yes.

Q. Did you state that you and Tyree were both on duty at the time?
A. Both on duty at the time.

Q. Did you state that Tyree sold you about 120 feet of rope?
A. Yes.

Q. Did you further state that you did not realize this was government property at first and that it was only after talking with 1SG Mathews on Thursday, 22 June 1978, that you realized it was government property?
A. Yes.

Q. Do you wish to in anyway change the statement you made on 23 June 1978?
Q. Yes.

(CONTINUED ON REVERSE SIDE)

EXHIBIT — INITIALS OF PERSON MAKING STATEMENT: EYA — PAGE 1 OF 4 PAGES

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF ___ TAKEN AT ___ DATED ___ CONTINUED." THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT AND BE INITIALED AS "PAGE ___ OF ___ PAGES." WHEN ADDITIONAL PAGES ARE UTILIZED, THE BACK OF PAGE 1 WILL BE LINED OUT, AND THE STATEMENT WILL BE CONCLUDED ON THE REVERSE SIDE OF ANOTHER COPY OF THIS FORM.

DA FORM 2823

STATEMENT (Continued)

Q. Would you relate what happened on 20 June 1978?
A. On 20 June 1978, I was at FFST 2 and I hand-receipted the rope from Specialist Tyree for rappelling that weekend.

Q. Did Tyree offer to sell you this rope?
A. No.

Q. To your knowledge, was Tyree acting within his duty standards in issuing you the rope?
A. Yes. Like I told you before, you know, it's supposed to be issued for reasons like duty but is always done; receipting rope for weekends and personal use; and then it's returned after it's been used. It's all O.K..

Q. When you hand-receipted this rope, did you intend to return it to FFST 2?
A. Yes.
Q. Do you have possession of the hand receipt that you used to obtain the rope?
Q. When did you decide not to return it to FFST 2?   A. No, I don't hang on to things
A.   didn't decide not to return it.                    like that.

Q. When had you intended to return the rope?
A. The following Monday - whatever day that was.

Q. What happened in the interim to change your mind and turn the rope in to 1SG Mathews?
A. After I was done talking to Peterson.

Q. What happened when you talked to Peterson?
A. I guess Peterson has something against Tyree, but I for sure didn't. Peterson offered me $20 to make a statement against Tyree to say he sold me the rope - but I, myself, had a personal grudge against Tyree at that time.

Q. What was that grudge for?

(CONTINUED ON CONTINUATION SHEET)

AFFIDAVIT

I, SP4 E4 ERIK Y. AARHUS, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1 AND ENDS ON PAGE 4. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

WITNESSES: [signature]
(Signature of Person Making Statement) Erik Y. Aarhus

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 30 day of November, 19 78 at Fort Devens, MA

[signature]
(Signature of Person Administering Oath)
DAVID P. CAREY, CPT, JAGC
(Typed Name of Person Administering Oath)

Article 136a(1), UCMJ
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT  EYA

PAGE 3 of 4 PAGES                                                    30 November 1978

CONTINUATION SHEET - DA FORM 2823

STATEMENT OF SP4 E4 ERIK Y. AARHUS (Contd):

A. I had asked Tyree - had made arrangements to go to Nashua to pick up my motorcycle on Wednesday afternoon. So I made all my plans around that date and he never showed or never said he wasn't going to do it. So I just waited. So I considered it a very personal insult and so I thought that there'll be a day to pay back.

Q. Did you accept the $20?
A. Yes.

Q. And after accepting the $20, did you make a statement against Tyree?
A. Yes, I did.

Q. Do you realize that the statement that you are now making is contrary to the statement you made on 23 June 1978?
A. Yes.

Q. Have you bought anything from Tyree?
A. No, I haven't.

Q. Do you have knowledge of any other criminal activity which Tyree may be involved in?
A. No, I don't. I'm not nosey.

Q. Why are you now making this contrary statement?
A. Because the other one is false and because of conscience.

Q. How come your conscience didn't bother you earlier?
A. It did, after I heard a rundown of what is going on; I wanted to get him back - revenge, but I didn't want to send him to jail.

Q. Are there any other reasons why you're making this statement today?
A. No.

Q. Has anyone promised you anything to make this statement?
A. No.

Q. Has anyone threatened you with anything to make this statement?
A. No.

Q. Have you been coerced by any means or by anyone to make this statement?
A. No.

(84)

PAGE 4 of 4 PAGES                                          30 November 1978

### CONTINUATION SHEET - DA FORM 2823

STATEMENT OF SP4 E4 ERIK Y. AARHUS (Contd):

Q. Do you have any knowledge of any other wrongdoings in Service Company?
A. No.

Q. Is there anything you would like to add or delete from this statement - any other comments you would like to make?
A. I can't think of anything right offhand.

Q. What is your current address?
A. Service Company.

Q. Are you in the barracks?
A. I moved back on base - because it is too expensive.

/ / / / / / / END OF STATEMENT / / / / / / /

# 'He Didn't Commit Suicide'

**Investigations:** Anguished relatives insist the U.S. military bungled probes and covered up murders

HE WAS A FIGHTER JOCK, A DECORATED veteran of 221 combat missions over Vietnam and third in command at the El Toro Marine Corps Air Station in El Toro, Calif. But on Jan. 22, 1991, Col. James Sabow, 51, was found shot dead in the backyard of his home, the victim of a blast to the head from his own shotgun. Sabow had been watching television coverage of the Persian Gulf War when his wife, Sally, left the house at 8:30 a.m. As she walked out the door she heard him answer the phone and repeat his name as though there were no response. When she returned an hour later, he was dead. The U.S. Marine Corps and the Naval Investigative Service concluded Sabow had committed suicide. His brother, Dr. John David Sabow, says the colonel was murdered because "he knew too much" about illegal covert operations at the base.

The body of marine Second Lt. Kirk Vanderbur was found at a private shooting range in Hubert, N.C., in February 1992. He had been shot twice—once in the abdomen by a shotgun loaded with birdshot, then in the head with a .223-caliber Ruger rifle. Despite the fact that the guns lay eight to 10 feet apart, the Naval Investigative Service concluded Vanderbur had committed suicide—which meant he must have crawled over to the Ruger rifle while badly wounded in a second attempt to take his own life. Vanderbur's mother, Lois, says there was no sign her son was despondent and that he sent a cheery letter to his younger brother—"little squirrelly bro"—the day before his death. "We don't know what happened, but we *know* he didn't commit suicide," she says.

These cases and dozens of others raise troubling questions about life—and death—in the military. According to The Philadelphia Inquirer, which printed a lengthy series on the controversy last year, 3,375 members of the U.S. armed services were listed as suicides between 1979 and 1993—and of those, grieving relatives have challenged the military's official findings in more than 60 cases. The families charge that military investigators have often lost or mishandled crucial evidence or failed to perform autopsies and laboratory tests. In some cases, they contend, investigators have attempted to cover up scandals or criminal conspiracies in the ranks. The relatives have formed a national organization called Until We Have Answers to protest what they see as the Pentagon's slipshod handling of suicide cases, and some have gone to extraordinary lengths to dispute the military's claims. The parents of marine Cpl. John MacCaskill Jr., an embassy guard found shot in a bar in El Salvador in 1988, have had his body exhumed twice in an attempt to prove he was murdered. "These families are not off the wall," says Frederick McDaniel, a former army lieutenant colonel who once commanded a criminal-investigations unit. "They've been treated very shabbily. The bottom line is, nobody gives a damn."

Sabow's immediate family filed suit against the navy and the Marine Corps, seeking damages for the intentional infliction of emotional distress and conspiracy to cover up his murder. The Sabows contend navy investigators ignored physical evidence that proves murder, including the fact that Sabow's fingerprints were not found on the shotgun or on the two shells in its firing chamber. Gene Wheaton, a former military investigator retained by the Sabow family, says the navy's criminal-investigation service is notably less competent than those of the other armed services. "They don't think like cops—they think like bureaucrats," he says. "They want to go in and close the whole thing out." Wheaton also claims the marine brass is concealing a pattern of covert arms smuggling that is "a continuation of Iran-contra"—and he implies that Sabow must have known something illegal was going on.

**Golf junkets:** But Sabow may well have had a motive for suicide. According to his brother, the colonel was removed from his post as assistant chief of staff at El Toro about five days before his death and was under investigation for the unauthorized use of marine aircraft. The purpose, reportedly, was golf junkets, not international arms smuggling. (The Marine Corps refused to comment on all aspects of the Sabow case.) J. D. Sabow says these charges were "phony and trumped up" and insists his brother "was going to blow everything out at a court-martial." Even so, Sabow faced the likelihood of an inglorious finale to a distinguished military career—and his brother, who alleges that marine officials conspired to wreck his own career as a neurologist, is clearly bent on avenging a family tragedy.

There may be a plausible explanation for Kirk Vanderbur's apparent suicide as well. David Grimes, a private investigator hired by the family, believes Vanderbur accidentally discharged the shotgun, opening a gaping wound in his stomach—and then, in excruciating pain, struggled to the Ruger rifle to kill himself. Why? As Grimes explains it, Vanderbur knew that he was slowly bleeding to death and that there was no one around to help him; the shooting range had closed for the weekend. "I can see putting an end to it," Grimes says. But, he says, Lois Vanderbur "didn't like the fact that I didn't find it was murder."

Under pressure from the families and from Congress, Pentagon officials are reviewing about a dozen suicide cases that still seem questionable. But the public's skepticism about the integrity and competence of military officialdom probably means that such investigations will always be emotional minefields—and a source of anguished controversy for years to come.

NINA ARCHER BIDDLE *in Chicago*

GARY ANDERSON—SIOUX CITY JOURNAL
**Minefields:** *Vanderbur with her son's photo, Sabow*